Gerald EVANS, Appellant,

v.

UNITED STATES, Appellee.

Wilkin D. LUMPKIN, Appellant,

v.

UNITED STATES, Appellee.

Nos. 11200, 11249.

District of Columbia Court of Appeals.

Argued March 8, 1978.

Decided Oct. 16, 1978.

---

lant Evans was found guilty of one count each of the same offenses. (It was stipulated that appellant Lumpkin had nothing to do with the crimes committed at the Hollis residence.)

Evans received concurrent sentences of 12 years to life on the Hollis counts and was sentenced to concurrent terms of five years to life on the counts pertaining to the Butler incident, the latter sentences to run consecutively to the Hollis sentences. Lumpkin was sentenced (in the Butler case) to concurrent terms of ten to 30 years for first-degree burglary while armed, first-degree burglary, and armed robbery. Additionally, he received consecutive sentences of two to ten years and one to ten years, respectively, for the assaults with a dangerous weapon upon Mrs. Butler and her child. He was sentenced to a concurrent term of incarceration for two to ten years for carrying a dangerous weapon; imposition of sentence was suspended as to the counts of robbery and assault with a dangerous weapon upon Mr. Butler.

Appellant Evans challenges his convictions principally on the following grounds: (1) that the court erred in denying his pretrial motion for a severance under Super.Ct. Cr.R. 14 of the Hollis and Butler counts; (2) that the court abused its discretion when it permitted government witnesses who later testified in rebuttal to remain in the courtroom during the defense presentation, and when those witnesses were allowed to confer with the prosecutor in the jury's presence during the cross-examination of defense witnesses; (3) that he was deprived of his Sixth Amendment right to present witnesses in his defense; and (4) that he was denied his Sixth Amendment right to confrontation by the court's refusal to allow cross-examination of one government rebuttal witness as to whether that witness was testifying under the influence of narcotics. We agree with Evans that the motions judge erred in failing to grant his severance motion, and on that basis we set aside his conviction.[1]

William R. Herman, Public Defender Service, Washington, D. C., for appellant Evans.

William Francis Xavier Becker, Washington, D. C., appointed by the court, for appellant Lumpkin. Herbert B. Dixon, Jr., Washington, D. C., appointed by the court, also entered an appearance.

Cheryl M. Long, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Michael W. Farrell, and Joseph B. Valder, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KERN, YEAGLEY and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellants were jointly tried before a jury and found guilty of the following offenses. For charges stemming from the February 13, 1975, burglary of the home of Clifton Butler, both appellants were convicted of burglary in the first degree while armed, D.C.Code 1973, §§ 22–1801, –3202; first-degree burglary, id., § 22–1801; armed robbery, id., §§ 22–2901, –3202; robbery, id., § 22–2901; three counts of assault with a dangerous weapon, id., § 22–502; and carrying a dangerous weapon, id., § 22–3204. For the December 11, 1974, burglary of the residence of Queen E. Hollis, appel-

1. The motion for a severance was renewed at trial, and it was denied then also. In view of our disposition of the appeal, we need not deal with the correctness of the second denial.

■ Appellant Lumpkin presents the following points of alleged error: (1) that the joinder of counts involving only Evans (*i. e.*, the Hollis crimes) with the counts involving both Evans and Lumpkin (*i. e.*, the Butler offenses) constituted misjoinder under Super.Ct.Cr.R. 8(b) necessitating reversal; (2) that if joinder was proper or objection thereto was untimely made, severance was required under Super.Ct.Cr.R. 14; (3) that the failure of trial counsel to file a pretrial severance motion constituted ineffective assistance of counsel; and (4) that the cumulative effect of certain specified errors denied Lumpkin a fair trial. Our consideration of these claims leads us to conclude that no error warranting reversal was committed, and we affirm Lumpkin's convictions.[2]

## I

### A. *The Hollis Episode*

At 11:30 p. m. on December 11, 1974, Queen Hollis responded to a knock at her door. She was confronted by two men who inquired as to the whereabouts of her neighbor, Helen Richardson. Hollis directed them next door and watched as they accosted Richardson, who had just emerged from her home.

Shortly thereafter, Hollis heard a second knock at her door and looked out her front window. One of the same two men, later identified as appellant Evans, purported to seek change for some money. When Hollis responded that she had no change, the two men kicked open her door, threatened her at gunpoint, and ultimately absconded with her money and certain medication which she possessed.[3] Both Richardson and Hollis later identified Evans as one of the two men involved in this incident. Miss Richardson indicated that she had previously met Evans socially and knew him as "Papa." She stated that on the evening of the burglary, he had approached her, claimed to be interested in the whereabouts of her boyfriend, and then questioned her about Miss Hollis. She identified Evans' companion—never further identified or apprehended—as a man named "Bob."

### B. *The Butler Episode*

Late in the evening of February 13, 1975, Clifton Butler responded to a knock at his door. Roxanne Johnson, an acquaintance of his, appeared at the door accompanied by a man who was not familiar to Butler. When Butler opened the door, that man and a male companion burst into the room with pistols drawn. A brief struggle ensued, during which a gun discharged. One of the intruders ordered Roxanne Johnson to lie down on the floor and then commanded Butler to produce money and marijuana. Butler demurred, claiming he had no marijuana and that all the money he possessed was in his pockets. One of the assailants then began to rummage through the bedroom in search of the desired items. During the search he questioned Mrs. Butler about some pills which he found. When the Butlers' child screamed, the robber threatened, "if you don't shut that goddam baby up, I'm going to blow his head off." Suddenly, the police arrived. The robber who had remained with Butler warned his cohort in the bedroom, "Pop, Pop, Pop, police at the door, police at the door." The man in the bedroom jumped out the second-floor window and fled. The other assailant, ap-

---

2. We do, however, remand his case with instructions to vacate his convictions (and related sentences) for first-degree burglary, robbery and assault with a dangerous weapon upon Clifton Butler. Those convictions merge with the more serious offenses (burglary in the first degree while armed and armed robbery) of which Lumpkin was convicted. *See, e. g., Woody v. United States*, D.C.App., 369 A.2d 592, 595 (1977) (robbery is a lesser-included offense of armed robbery); *Bell v. United States*, D.C.App., 332 A.2d 351, 354 (1975) (as-sault with a deadly weapon is a lesser-included offense of armed robbery).

3. Miss Hollis thus described a part of the intruders' assaultive conduct:
   And then he said, "Get down on the floor." So I got down on the floor and he said, "Bitch lay down there and don't you look up. * * You better get your head down or I'll put a bullet through your head."

pellant Lumpkin, was disarmed and arrested.

When Butler returned from the police precinct, he and his wife discussed the incident. They then agreed that they recognized the man who had been referred to as "Pop" as appellant Gerald Evans, an old schoolmate of Butler's. Mrs. Butler added that she had last seen Evans in 1968 or 1969 and that she knew him then as "Black Papa." They subsequently identified Evans both from a photographic array and at a lineup.

C. *The Defense Evidence*

Appellant Lumpkin, testifying on his own behalf, admitted his presence in the Butler home but asserted that he and Roxanne Johnson visited the Butlers to discuss a marijuana sale which Lumpkin previously had consummated on Butler's behalf. When Lumpkin could not produce the proceeds of the sale, an armed man, who already was in the Butler home, stepped forward and volunteered to handle the situation. Butler declined this assistance and the gun accidentally discharged. At that time the police arrived and the unidentified armed man fled via the bedroom. Lumpkin asserted that Mrs. Butler trumped up the robbery charge, and he insisted that he had not been acquainted with Evans prior to trial. Leroy Leonard, called as a witness on Lumpkin's behalf, testified that Butler had been selling marijuana early in 1975. (Butler previously had denied during cross-examination that he sold marijuana.) The trial court refused to allow Evans to call an additional witness, a Mr. Baba, to testify that Butler had been selling marijuana as late as 1974.

Appellant Lumpkin was impeached with a 1969 conviction for attempted petit larceny and a 1970 conviction for second-degree burglary.

Appellant Evans did not testify, but his counsel presented the following evidence. Witnesses Walter Moore and Lenette Brooks testified that on December 11, 1974

(the date of the Hollis burglary) they posted bond for Evans, who had been taken to a police station following his arrest for driving without a license. Evans and his friends then spent the remainder of the evening partying, and, according to Moore, Evans did not depart until well after midnight.[4] During the course of the evening, Helen Richardson allegedly came by looking for her boyfriend. She mentioned that her neighbor had been robbed and that she knew something about the robbery.

Roxanne Johnson also testified on Evans' behalf. On the evening of the Butler burglary, she was visited by a friend, Marion Johnson, and Lumpkin, who at that time was unknown to her. They were seeking drugs and decided to attempt to obtain them from Butler. She contended that Marion Johnson was the man who fled from the bedroom and that Evans was in no manner connected with the incident. On cross-examination, she denied having mentioned to anyone that Evans had threatened her with regard to her testimony. She did claim, however, that Marion Johnson had threatened her.

The trial court precluded Evans from calling another witness, Ingrame Bay, who would have testified that Evans had weak knees and would have had a difficult time making good an escape through the Butlers' second-story window.

D. *The Government's Rebuttal Evidence*

Helen Richardson testified on rebuttal that she did not visit the party on the evening of the Hollis robbery. Instead, she stated that she went to that address on the following day. Clifton and Jacqueline Butler denied ever having met either Leroy Leonard or Marion Johnson. Mrs. Butler further testified that Roxanne Johnson previously had told her that "Black Papa" had threatened her with regard to her testimony. Another witness, Robert Pressley, corroborated this statement. The trial court denied a request by counsel to question

4. Brooks' version of the evening's events differed slightly from Moore's in that she claimed

that she and Evans left together and spent the night at the Florida Avenue Tourist Home.

Pressley as to whether he was under the influence of narcotics at the time of his testimony. Five rebuttal witnesses were called by the government. All five, whose testimony was directed solely against Evans, had been allowed to remain in the courtroom during the testimony by defense witnesses.

## II

Evans' first claim on appeal focuses on the denial of his motion to sever the trial of the Hollis incident from the trial of the Butler incident. He concedes that the offenses, which were "of the same or similar character," were properly joined pursuant to D.C.Code 1973, § 23–311(a), and Super. Ct.Cr.R. 8(a).[5] However, he contends that severance was mandated under the provisions of D.C.Code 1973, § 23–313, and Super.Ct.Cr.R. 14, both of which provide:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires.

We must determine whether the record reveals a sufficient possibility of undue prejudice by reason of the joinder as to warrant reversal. We conclude that it does.

■ We note initially that when offenses of a "similar character" are joined at trial there is a substantial risk of prejudice.

> Our cases therefore require that when joinder of offenses is based on the fact that the crimes are of a "similar character," a motion to sever should be granted unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, or (2) the evidence of each of the joined crimes

would be admissible at the separate trial of the others. [*Bridges v. United States*, D.C.App., 381 A.2d 1073, 1075 (1977); *see Tinsley v. United States*, D.C.App., 368 A.2d 531 (1976); *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1946).]

Evans' pretrial motion to sever the Hollis and Butler offenses was denied by the motions judge on the ground that evidence of either offense would have been admissible if introduced at separate trials to establish the identity of the accused. The trial judge thereafter declined to overturn the motions judge's ruling.

■ While the prosecution may not introduce evidence of other crimes to demonstrate the accused's tendency to commit the crime at issue, or to indicate that the defendant is an individual of criminal character, *see Bridges v. United States, supra*, at 1075; *Tinsley v. United States, supra*, at 533, such evidence may be admitted if it is relevant to establishing the identity of the individual charged with the commission of the crime on trial. *Drew v. United States, supra*, 118 U.S.App.D.C., at 16, 331 F.2d at 90. However, such evidence is admissible only if the facts surrounding the commission of the crimes are so distinctive and unusual that there is a reasonable probability that the same person committed both offenses. *Drew v. United States, supra*, at 16, 331 F.2d at 90; McCormick, Evidence § 190 at 449 (2d ed. 1972).

■ The government cites the following common factors pertaining to the Hollis and Butler incidents which it contends are sufficiently unusual and distinctive to create a reasonable probability that the same person committed both offenses. Each burglary involved: (1) the nighttime entry of an occupied dwelling place by two young Negro males who (2) demanded money and expressed an interest in drugs. Additionally, each entry (3) was facilitated by means

---

5. Super.Ct.Cr.R. 8(a) and D.C.Code 1973, § 23–311(a), both provide for permissible joinder of offenses under the following circumstances:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

of a ruse which involved a third person; (4) the victims were either threatened or physically assaulted; and (5) one of the intruders was identified by the nickname "Papa." We view none of these factors as sufficiently distinctive, in the context of this case, to warrant the introduction of evidence under the identity exception. However, factors (3) and (5) warrant further discussion.

Addressing ourselves to the third factor, the ruse to facilitate entry, we view the manners of ingress in the two burglaries as too dissimilar to fall properly within the identity exception. In the Hollis robbery, appellant Evans and his accomplice apparently sought to ascertain exactly who resided in the home before burglarizing the premises. In their conversation with Miss Richardson they made inquiries about Miss Hollis. The most logical inference to be drawn from their actions is not that they used their acquaintance with Richardson as a means of obtaining Hollis' trust. Rather, they sought merely to obtain some information about the resident of the dwelling they intended to burglarize prior to the actual commission of the crime. In contrast, to facilitate their burglary of the Butler home, with whose occupants they were already familiar, Evans and Lumpkin prearranged an entry which played upon Mr. Butler's familiarity with Roxanne Johnson. These techniques were not sufficiently similar and distinctive to warrant invocation of the identity exception.[6]

Turning now to the fifth factor, the use of the nickname, "Papa," appellant Evans correctly points out that the name was not mentioned by either assailant during the Hollis burglary. Miss Richardson identified Evans as someone she knew as "Papa" some time after the burglary. While the circumstances of the Butler offense indicated that one of the assailants bore the nickname Pop or Papa, nothing about the Hollis crime leads to the same conclusion. Therefore, the existence of this nickname may not be considered as a common stamp of identity.[7]

We conclude that any characteristics of possible similarity between the two offenses are too speculative to point with sufficient certainty to the identity of Evans as a perpetrator of both of the crimes. The offenses, therefore, should have been severed for trial.

While joinder also may be permitted if the offenses involved are fairly separable by simple and distinct proof, *Dunaway v. United States*, 92 U.S.App.D.C. 299, 205 F.2d 23 (1953), that is not the case here. As we have said:

> Once the "identity exception" to the "other crimes" rule has been rejected, the points of potential similarity cut the oth-

---

6. As appellant Evans points out, we have had occasion to consider several first-degree burglary cases in recent years in which the intruders utilized a ruse to gain entrance to a home. In *Smith v. United States*, D.C.App., 330 A.2d 519 (1974), the complainant unlocked his apartment door when someone requested entrance to deliver a package. The "delivery man" and two other men burst into the apartment firing weapons. While searching for money and narcotics, they also assaulted complainant and a visitor of his. *Id.*, at 520. In *Wilson v. United States*, D.C.App., 357 A.2d 861 (1976), Wilson and another man entered the apartment of complainant as visitors, forcibly subdued complainant, and fled with his wallet and several other items. *Id.*, at 862. Another ruse proved successful in *In re R.D.S.* D.C.App., 359 A.2d 136 (1976). The complainant's neighbor came to her door one evening and asked to use the telephone. Once inside, he assaulted her and stole her wallet. *Id.*, at 137. Most recently, in *Clyburn v. United States*, D.C.App., 381 A.2d 260 (1977), appellant came to the complainant's home allegedly seeking an acquaintance who boarded there. The acquaintance was not in and appellant, joined by a friend who had arrived in the interim, discussed with complainant the possibility of renting a room. That evening, the two men returned, rang the doorbell, and insisted on leaving a deposit for a room. Following their admittance, they beat and raped complainant and ransacked her apartment. *Id.*, at 261–62. These cases indicate that the perpetration of a burglary by means of some sort of a ruse is a sufficiently common occurrence so that we should exercise caution when considering whether the techniques utilized are so alike as to come within the identity exception.

7. It is not necessary for us to determine whether the inadvertent use of a nickname during the commission of a crime may serve as a distinctive factor for purposes of the identity exception.

er way. Every suggestion at trial that the two crimes were in some way similar increased the likelihood that the jury became confused or misused the evidence. [*Tinsley v. United States, supra,* at 537; see *Drew v. United States, supra,* 18 U.S. App.D.C. at 17, 331 F.2d at 94.]

In this case, the prosecutor focused on the supposed similarities between the two crimes during his closing argument to the jury.[8] The government recognizes in its brief that "the Government's evidence painted Evans as a habitual criminal who seemed to specialize in bold burglaries in which he callously terrorized people inside their homes. . . ." Under these circumstances, it is highly possible that the jury misused the evidence.

For these reasons, we conclude that the joinder of the two offenses impermissibly prejudiced Evans at trial. Accordingly, as to Evans, the judgments of conviction are reversed and the case is remanded for a new trial.[9]

### III

██ Appellant Lumpkin alleges that he and Evans improperly were joined in the same indictment under Super.Ct.Cr.R. 8(b).[10] We do not find it necessary to reach that issue, however, because Lumpkin waived any rights he might have had based on misjoinder under Rule 8 by failing to timely request a severance. Super.Ct.Cr.R. 12(b)(2) requires defendants to assert objections to defects in an indictment prior to trial.[11] When Rule 12(b)(2) is read in con-

---

**8.** In his final argument, the prosecutor made the following comments:

Now, you will remember in my opening statement when I described generally what the evidence would be that I asked you throughout the case to listen and compare those two situations to see if you thought they were similar or not similar. . . . I asked you to compare those two situations and see if what happened in your judgment is not just like a signature to indicate the identity of one of the persons who was at Queen Hollis' and one of the persons who was at the Butlers'.

What are those similarities? Two young Negroes armed both with handguns about the same time of night break in and commit an armed robbery during which death threats are given, "I'll kill you Bitch," or, "Lay down or I'll blow your brains out" or whatever. The apartments are ransacked and you look at the pictures. I don't have to show them to you but in Queen Hollis' home, her bedroom area, how it's torn up. In the Butler home, how its bedroom area is torn up. A person identified as Mr. Evans in both situations looks for drugs, pills. He's interested in them of course, in the Butler situation. He told them they were fluid pills, he didn't want them. But you ask yourself based on everything you heard about the Hollis situation, the Butler situation whether the similarities doesn't [*sic*] tell you something about the identity of the persons who are committing. One person who is committing both of these offenses.

Now, [defense counsel] commented somewhat on principles of law, separate transactions, that is correct, you have to determine Mr. Evans' guilt on each transaction. That is right, but that doesn't mean in figuring out what happened to Queen Hollis they can for-

get about what happened at the Butlers', that's the reason the two cases are here together is for your comparison to see if that proves identity to the Hollis case and on the Butler case.

**9.** Our resolution of the joinder issue renders unnecessary any resolution of the numerous other claims of error raised by Evans.

**10.** That rule provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

**11.** Rule 12 states in pertinent part:

(b) PRETRIAL MOTION. Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion and in accordance with Rule 47–1. The following must be raised prior to trial:

\* \* \* \* \* \*

(2) Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or charge an offense which objections shall be noted by the court at any time during the pendency of the proceedings); . . . . .
Rule 47–1, which is incorporated in Rule 12(b), provides in part:

(c) TIME FOR FILING. All motions . . shall be filed within 10 days of arraignment or entry of appearance of counsel whichever date is later, unless otherwise provided by the court.

junction with Rule 47–1(c), as it must be, it is clear that under these rules a failure to timely raise a Rule 8 objection within ten days of arraignment or the entry of an appearance by counsel, whichever is later, constitutes a waiver of that objection. Super.Ct.Cr.R. 12(b)(2) and 47–1(c); *see Cupo v. United States*, 123 U.S.App.D.C. 324, 327, 359 F.2d 990, 993 (1966), *cert. denied*, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967). Such a rule is both logical and useful, since defects in an indictment based on misjoinder are immediately recognizable. To permit delay in bringing such a defect to the attention of the court would result in costly and unnecessary joint prosecutions which, in the absence of a waiver provision, otherwise might have to be terminated in midtrial upon a belated assertion of the misjoinder.

■ We are not persuaded by Lumpkin's argument that since the trial judge felt bound by the pretrial ruling of the motions judge on Evans' severance motion, any motion based on misjoinder under Rule 8 that Lumpkin might have filed also would necessarily have been rejected by the trial judge on the basis of the pretrial ruling in Evans' case. Initially, we note that Lumpkin did not join in Evans' severance motion until after it had been denied. Therefore, he cannot now benefit from the issues raised in that motion. Additionally, Evans' severance motion was not based on an allegation of improper joinder under Rule 8(b). Evans [who never addressed the Rule 8(b) issue] conceded that the counts in the indictment properly were joined under Rule 8(a), and asserted only that he was entitled to a severance under Rule 14 because he would be unduly prejudiced by the permissible joinder. We do not see, therefore, how the denial of Evans' motion, which raised a separate issue, could have constituted the law of the case as to Lumpkin's potential claim. While the trial court may have labored under such a misconception, that would not excuse Lumpkin from his obligation to file a timely motion for relief from misjoinder.

■ Lumpkin argues, in the alternative, that if we determine that he waived his rights under Rule 8(b), the failure of trial counsel to file a timely motion for severance constituted ineffective assistance of counsel. We have frequently articulated the standard of review of ineffective assistance of counsel claims as whether the "gross incompetence of counsel [has] in effect blotted out the essence of a substantial defense." *Angarano v. United States*, D.C. App., 312 A.2d 295, 298 (1973), *petition for reconsideration denied*, 329 A.2d 453 (1974) (en banc); *see Horton v. United States*, D.C.App., 377 A.2d 390 (1977); *Bruce v. United States*, 126 U.S.App.D.C. 336, 379 F.2d 113 (1967). Mere errors in judgment do not constitute "gross incompetence." *See Woody v. United States*, D.C.App., 369 A.2d 592, 594 (1977).

■ We view counsel's conduct as a tactical decision which hindsight reveals to have been unfortunate. It was not unreasonable for counsel to conclude that a joint trial might work to Lumpkin's advantage. Evans, accused of two offenses and obviously having been the most venal of the three participants, was likely to be viewed by the jury as the violent mastermind of the crimes. Lumpkin was more likely to be seen as his not-so-hardened accomplice in one of the offenses. Only Roxanne Johnson's testimony weakened this theory. As soon as counsel for Lumpkin realized that Miss Johnson would be called to testify, he moved for a severance. Obviously, counsel then was well aware of the strengths and weaknesses of Lumpkin's case, or he would not have been so quick to realize that his strategy would be shaken by Miss Johnson's story. In fact, when counsel requested a severance, he explained his prior failure to do so as follows:

> . . . at the time the decision was made not to seek a motion for severance we were of the understanding that this witness [Roxanne Johnson] could not be located but this witness has, in fact, been located and if this witness is the same

person whom I believe the witness to be, I'm compelled at this time to move the court for severance of defendants. If this witness should testify.

It would be illogical to assume, therefore, that counsel's failure to raise the misjoinder issue earlier constituted "gross incompetence." Rather, it was a tactical decision which later backfired.

■ Lumpkin further asserts that if he is deemed to have waived any Rule 8(b) objection he might have raised, the trial court nevertheless committed reversible error in failing to grant his midtrial motion for a severance pursuant to Rule 14. Unlike a Rule 8 claim which will be waived if not raised within a certain period prior to trial, the court has a continuing obligation to grant a severance of codefendants if, at any time during trial, undue prejudice to either defendant arises as a result of the joinder. *Schaffer v. United States*, 362 U.S. 511, 516, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); *United States v. Leonard*, 161 U.S.App.D.C. 36, 46, 494 F.2d 955, 965 (1974). It is well settled, however, that the trial court is vested with substantial discretion in determining whether to grant a motion for severance. That determination will not be disturbed on appeal except upon a showing of a clear abuse of discretion. *Clark v. United States*, D.C.App., 367 A.2d 158, 160 (1976).

■ Lumpkin claims that he was prejudiced in that (1) the jury, in reaching its determination on Lumpkin's guilt, improperly considered the evidence presented with regard to the Hollis offenses which were committed by Evans, and (2) his presentation of a defense which was mutually antagonistic to that of his codefendant caused the jury unjustifiably to infer from this conflict alone that both defendants were guilty. *See Rhone v. United States*, 125

U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966). In support of his first claim of prejudice, Lumpkin cites the trial court's failure to instruct the jury as to the importance of the stipulation agreed to by counsel, namely, that Lumpkin had not been involved in the Hollis incident. The court did, however, state to the jury that such a stipulation had been entered into.[12] Further, the prosecutor, during closing argument, reminded the jury of Lumpkin's non-involvement in that incident.[13] No evidence indicated in any way that Lumpkin had participated in the Hollis offense; in fact, Helen Richardson testified that Evans' accomplice during the Hollis burglary was a man named "Bob," thus further deflecting even a hint of suspicion away from Lumpkin.

Turning now to Lumpkin's second claim of prejudice, we conclude that Lumpkin's and Evans' defenses were not so inherently contradictory that the jury would be likely to infer guilt by virtue of the conflict alone. Evans presented an alibi defense to the Butler claim. Lumpkin acknowledged his own presence in the Butler home but denied that any robbery occurred or that Evans had been there. The conflict arose not from these quite reconcilable defenses, but rather from the testimony of Roxanne Johnson. Miss Johnson, called on behalf of Evans, sought to absolve Evans of any connection with the Butler offense, and testified that Lumpkin and another man, Marion Johnson, went to the Butler home on the evening in question in order to obtain some drugs. Certainly this testimony weakened Lumpkin's defense. Nevertheless, "a testimonial conflict between codefendants is not alone sufficient ground to require a separate trial." *Baxter v. United States*, D.C. App., 352 A.2d 383, 385 (1976); *see United*

---

12. During the direct examination of the complainant Hollis, the court informed the jury:

It has been stipulated, ladies and gentlemen of the jury, that the evidence that you are now hearing from Miss Hollis with respect to the incident that occurred December 11, 1974, has no reference whatsoever to Mr. Lumpkin, who is one of the defendants in this case.

13. The prosecutor stated:

And once again, I will reiterate something when [*sic*] mentioned early in the case. Mr. Wilkin Lumpkin is not charged and is in no way connected in what happened in Queen Hollis' house and do not think that he is because he is not.

*States v. Robinson*, 139 U.S.App.D.C. 286, 289, 432 F.2d 1348, 1351 (1970).

The evidence against Lumpkin was strong. He was apprehended by the police in the home of the Butlers, who asserted that he had robbed them. The jury was faced with a question of credibility—whether to believe the Butlers' claim that a robbery occurred or to accept Lumpkin's testimony that he sought merely to discuss a prior marijuana sale and suddenly was set upon by an unknown, armed individual. The jury chose to believe the Butlers. The same credibility question would have remained an issue in separate trials. The resolution of this dispute by the jury and the strength of the identification testimony contributed significantly to Lumpkin's conviction. We cannot say, therefore, that the conflict between Lumpkin's and Evans' defenses alone caused the jury to return a guilty verdict.[14] Accordingly, we conclude that the trial court did not abuse its discretion in denying the severance motion. In the absence of any such abuse, we must affirm. *See Baxter v. United States, supra*, at 385; *Jackson v. United States*, D.C.App., 329 A.2d 782, 787 (1974).

## IV

We have examined Lumpkin's remaining contentions and find them to be without merit. We address each point briefly.

### A. *The Bomb Scare*

Following evacuation of the jury panel due to a bomb scare, counsel for Lumpkin requested the empanelling of a new jury. That request was denied. Alternatively, counsel requested an individual voir dire for each member of the panel on their reactions to the bomb scare, which he feared they would attribute to the defendants. This request also was denied, although the court offered to voir dire the panel collectively. Counsel rejected that suggestion, continuing to demand an individual voir dire.

The trial court enjoys broad discretion in conducting a voir dire, *see Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931); *Harvin v. United States*, D.C.App., 297 A.2d 774 (1972), and the exercise of that discretion is limited only by "the essential demands of fairness." *Aldridge v. United States, supra*, 283 U.S. at 310, 51 S.Ct. 470; *Harvin v. United States, supra*, at 777. "[A]bsent abuse . . . of discretion, and a showing that the rights of the accused have been substantially prejudiced thereby, the trial [court's] rulings as to the scope and content of *voir dire* will not be disturbed on appeal." *United States v. Robinson*, 154 U.S. App.D.C. 265, 269, 475 F.2d 376, 380 (1973). While a voir dire on the bomb scare might have been advisable to determine if the impartiality of the panel members had been threatened, collective questioning, as the court proposed to do, would have sufficed. We cannot say that the trial court abused its discretion in denying the request for an unnecessarily time-consuming individual voir dire.

### B. *The Outburst In Court*

Lumpkin asserts that when Evans engaged in a "violent and unprovoked" outburst during trial, he prejudiced the jury to such an extent that Lumpkin was denied a fair trial. He cites as error the trial court's failure to declare a mistrial or, in the alternative, to ascertain the effect that the outburst had on the jury.

Initially, we differ with Lumpkin's characterization of the outburst as "violent." In the midst of the prosecutor's cross-examination of Roxanne Johnson, Evans exclaimed: "God damn. What you man trying to do with it. I've been going through this sitting here going through this shit for a man in my mind. I'm tired, man." The jury was immediately excused. The record does not reflect any violent behavior on the part of Evans, and the trial court assessed the jury's reaction to the outburst as one of

---

14. We note also that this conflict might well have existed even if separate trials had been held. Roxanne Johnson could have been called as a government witness, either testifying voluntarily as she did in the trial at issue, or under a grant of immunity.

curiosity rather than shock or fear. The trial court instructed the jury at length to disregard Evans' brief emotional display, and to reach a verdict based solely on the evidence.

"A motion for mistrial is addressed to the sound discretion of the trial judge." *Hammond v. United States*, D.C.App., 345 A.2d 140, 141 (1975); *United States v. James*, 151 U.S.App.D.C. 304, 466 F.2d 475 (1972). While we have not had occasion previously to address the issue of an appropriate remedy for an outburst by a codefendant, we seek guidance in two decisions by the Second Circuit which speak to this question. In *United States v. Aviles*, 274 F.2d 179 (2d Cir. 1960), the trial court issued an instruction similar to the one given here to cure any prejudice which might have arisen from an outburst by one of several codefendants. That outburst involved an accusation that the other codefendants were convicts, some of whom were currently serving time in jail. Despite the highly prejudicial nature of those remarks, the trial court's response was held to be adequate. The Second Circuit reasoned:

> If such conduct by a co-defendant on trial were held to require a retrial it might never be possible to conclude a trial involving more than one defendant; it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so. [*Id.*, at 193.]

In *United States v. Bentvena*, 319 F.2d 916 (2d Cir. 1963), based on comparable reasoning a similar result was reached in considering outbursts which were both numerous and violent.

While it is not necessary for us to expressly approve the holdings of *Aviles* or *Bentvena*, the approach utilized by the Second Circuit may be appropriately applied to the circumstances of this case. The disruption caused by Evans did not include any prejudicial remarks about co-defendant Lumpkin. Any adverse reaction toward Lumpkin by members of the jury which might have been triggered by Evans' brief emotional display was adequately tempered by the trial court's careful instructions. The denials of Lumpkin's requests for a mistrial or an individual voir dire were proper.

C. *The Prosecutor's Closing Argument*

During the course of his closing argument, the prosecutor, without objection from defense counsel, made a brief reference to the defense witnesses as "a gang of felons." Immediately preceding this remark, which appears to have been directed primarily toward the witness Leonard, the prosecutor had cited a prior conviction of appellant Lumpkin for armed robbery and had stated: "That armed robbery conviction, that's for credibility, do you want to believe him?"

▬▬▬ The prosecutor's characterization of the defense witnesses as "a gang of felons" was improper. It constituted inflammatory language and was offensive to the dignity of the court. *See Maxwell v. United States*, D.C.App., 297 A.2d 771, 773 (1972), *cert. denied*, 412 U.S. 921, 93 S.Ct. 2740, 37 L.Ed.2d 147 (1973). This type of remark serves only to blur the already murky distinction which the jury must draw between the use of evidence of prior crimes as a reflection on credibility and the use of such evidence as a denotation of criminal character.

An error of this sort does not, however, automatically require reversal. *See, e. g., United States v. Jones*, 157 U.S.App.D.C. 158, 165, 482 F.2d 747, 754 (1973). In light of defense counsel's failure to object to the remark, and considering the prosecutor's earlier comment to the jury that Lumpkin's prior conviction for armed robbery reflected solely on his credibility, we are satisfied that this unfortunate reference did not affect the verdict.[15] *See Miles v. United*

---

15. Finally, we note briefly that the appearance in the jury room of a bullet which had no relationship to this case did not necessitate the declaration of a mistrial. The trial court carefully instructed the jury that this bullet had nothing to do with the case and that they should disregard it in their deliberations. We are satisfied that the jury's judgment was not

*States*, D.C.App., 374 A.2d 278, 284 n.9 (1977); *Villacres v. United States*, D.C. App., 357 A.2d 423, 428 (1976).

## V

In summary, appellant Evans' convictions are set aside and his case is remanded for new trials. Appellant Lumpkin's convictions, with the exception of his convictions for the lesser-included offenses of robbery, first-degree burglary, and assault with a dangerous weapon upon Clifton Butler which are vacated, are affirmed, and his case is remanded for resentencing consistent with this opinion.

No. 11200: *Reversed and remanded.*

No. 11249: *Affirmed in part, vacated in part, and remanded.*

substantially swayed by the inadvertent admission into the jury room of this unauthorized evidence. *See Vaughn v. United States*, D.C. App., 367 A.2d 1291, 1296 (1977).