Ennis W. **BRADLEY**, Appellant

v.

**UNITED STATES** of America,
Appellee.

No. 22070.

United States Court of Appeals
District of Columbia Circuit.

Argued March 27, 1969.

Decided Sept. 10, 1969.

Tamm, Circuit Judge, dissented.

182

Mr. Milton S. Gwirtzman, Washington, D. C. (appointed by this court), for appellant.

Mr. Clarence A. Jacobson, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., at the time the brief was filed, Frank Q. Nebeker, Asst. U. S. Atty., at the time the brief was filed, and William H. Collins, Jr., Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge.

Appellant Bradley was convicted on two counts of passing forged checks and two counts of causing them to be transported in interstate commerce. He was given four concurrent two-to-six year sentences. For the reasons stated, we reverse and remand for a new trial.

### 1. The Evidence

The prosecution established that Bradley cashed checks bearing the forged signature of "David Scott," payable to Bradley and endorsed by Bradley. The checks, drawn on the Wilmington Trust Co., were prepared on a check writer machine which had been stolen on December 20, 1966, along with 604 checks, from Scott Motors Company in Wilmington.

Two checks for $52.40 each were cashed on December 27, 1966, one at a Safeway's and the other at Hayden's liquor store. The two other checks, for $145.80 each, were cashed on December 29, again at the Safeway's and Hayden's.

Because we think it useful for an understanding of the issues, we shall depart from the usual order and shall begin with a rather full statement of defendant's testimony, and shall then take up the testimony of the prosecution's witnesses.

### Defendant's Testimony

Defendant's account reveals that he was a 48-year-old housepainter who had been out of work since Thanksgiving. On December 26, 1966, he had returned to Washington from a visit to his daughter and grandchildren in Fredericksburg. He was drinking a beer in Carry's Restaurant when he was approached by a former acquaintance he had known two years previous, but only as "Jimmy." Jimmy said he was now in business with Scott Motor Company in Delaware, with some relatives. Jimmy asked Bradley to join him on a date he had arranged with two girls. Bradley regretted he was "too darn broke to go any place." Jimmy said he had no desire going out with two women by himself, so Bradley did not need any money. They drank some whiskey from paper cups in the auto en route, and more whiskey at a grill where they met the girls. They took one of the girls home, and Jimmy's car got stuck in the snow at her trailer camp. So they spent the night in the trailer, where more liquor was consumed.

Next day, after another "drinking party," they dug the car out and returned to Washington about 3:30 p. m. On the way Jimmy asked Bradley if he had

made another date with his girl, but again Bradley said he was too "broke." Jimmy then asked if he knew anybody in Washington who could cash a check for him. Bradley replied he could cash a check either at his Safeway or at Hayden's liquor store. Jimmy removed from his trunk and brought into Bradley's basement apartment a check-writing machine and brief case containing checks and made out a check to Bradley for $52.40, telling him to get some eggs, coffee, and cigarettes. Bradley asked why he signed the check "David Scott." Jimmy said that was his right name, David Scott, that "Jimmy" was only a nickname since childhood. He also explained, when asked, that he took the machine with him since he did not want to leave the machine and checks in Delaware while he was on vacation. Bradley got Gilbert Perkey, Safeway's manager, to okay the check, and he returned the change to Jimmy. Bradley had been cashing checks about every other week with Safeway for about four or five years, and was known by Perkey.

After a couple more drinks of whiskey, Jimmy wrote another $52.40 check and asked Bradley to cash it at the liquor store, and buy some whiskey and beer. Jimmy said they were going out together and he wanted Bradley to have as much money as he had to spend. After Bradley got this check cashed at Hayden's liquor store, where he was a regular customer, he returned the change to Jimmy who told him to keep $10.00 for the night's expenses.

The night of the 27th was spent in more drinking, in the car, at the grill until it closed, and then back at the house of one of the girls.

After more drinking on the 28th, Jimmy and Bradley returned alone to the latter's apartment to get some sleep. On the morning of the 29th, after more drinking, Jimmy said he would have to get some more money in order to go on a trip to Reno, Nevada, planned for his vacation, as well as for their joint need of more whiskey. Bradley agreed to get a $145.80 check cashed at the Safeway and he returned to the apartment with Jimmy's money. Then Jimmy talked Bradley into cashing one final check for the same amount at Hayden's liquor store. Jimmy explained to Bradley he used two checks because he did not want to make a check so big the store might not have enough money to cash it.

They spent the rest of the 29th drinking and looking for the girls. The 30th they got Jimmy's car washed, oiled and greased for his Reno trip. On the 31st Bradley awoke to find Jimmy gone. Bradley went to a bar to spend New Year's Eve. On the way home he slipped on the ice and broke his left leg. He spent the next 18 days in Casualty Hospital.

On January 9 or 10, Bradley learned from his daughter that Mr. Perkey had told her a check had been returned for improper signature. On January 18, Bradley returned from the hospital to his apartment, and Perkey visited him to tell him the $52.40 check had been returned. Appellant asked about the other check. Perkey did not recall having cashed another check, and had received no notice of dishonor.

The next morning Bradley called David Scott at Scott Motors in Wilmington and asked him why he had given him a bad check. The real David Scott explained that several hundred company checks and the check writer machine had been stolen and said he was the third person from Washington who had called. Bradley then called the FBI in Washington and told Agent MacCabe what had happened. He had found the check-writing machine in his apartment pantry on return from the hospital and told MacCabe where it could be found. He readily allowed his photo, fingerprints, and handwriting sample to be taken by the FBI. He phoned Hayden's liquor store to say the checks were no good and he would be in touch with them. He then left for Fredericksburg, Virginia, to stay with his daughter until he was off crutches and could work. When he returned to Washington in April he was

contacted by MacCabe. They arranged a meeting, at which MacCabe showed him pictures of Jimmy, whom he identified. Appellant was arrested at that time.

On cross-examination appellant reiterated that he did not know the checks were forged, and said that if he had known this he would never have taken them for cashing at the two stores where he dealt regularly and was personally known. He conceded that he might have been more suspicious if he had not been drinking so much, but as it was he did not distrust the explanation given by Jimmy, whom he had known as a businessman who owned two ice cream trucks in Washington, and who was now on a vacation in which he wanted company. Even after Perkey's visit about the first check he does not really seem to have appreciated the situation. He took the initiative of phoning Scott, the FBI, and Hayden's. He told Agent MacCabe about the location of the check-writing machine he had found in his apartment on returning from the hospital.

### Testimony of Prosecution Witnesses

As to the prosecution witnesses, FBI Agent MacCabe testified primarily only as to his interview with Bradley, Perkey, and Gregory, the manager of Hayden's. Gregory confirmed that Bradley was a regular customer there, but had no recollection of the cashing of the checks. Perkey confirmed that every other week over a period of four years he had cashed checks for Bradley written by various employers, in the District, Maryland, and Virginia. He was "kind of friendly" to Bradley, and continued this service even though he did not have a file on Bradley when Safeway instituted its registration policy.

Perkey also testified that he questioned the first Scott check, asking Bradley what he was doing with a check on an out-of-town bank, and that Bradley said the Scott people were establishing a place in Washington and he was doing some work for them. Defendant

denied that any question had been asked by Perkey, or that he had said this.

A. *Issue of Defense Access to Grand Jury Minutes Prior to Cross-Examination.*

After Perkey testified, defense trial counsel asked for the grand jury minutes of his testimony. The trial judge ruled that the request should have been made months before (at which time appointed counsel did not represent appellant). Since the request would require transcription and interruption of the trial, the judge ruled that the minutes would be denied unless "some peculiar reason shows up why you need it after he testified."

The Government argues that Perkey was not a truly "key" witness, and "only one bit" of Perkey's testimony went to the issue of defendant's knowledge of the forgery. But Perkey was the only Government witness giving personal recollection as to any of the check-cashing incidents. He did not recall various aspects of the first cashing incident, and admittedly had had no personal recollection at all of cashing the second (and much bigger) check. What he did purport to remember was that defendant said he was doing work for Scott, and his supporting testimony of why he happened to remember this and little else undoubtedly related to a highly material aspect of the case. Its full impact, which appears from the record as a whole, was not as apparent as of the time he finished his testimony.

By the time the judge ruled on the request for grand jury minutes, the Supreme Court had already announced that access to grand jury minutes should be available, as to a witness who has testified, in consonance with the "growing realization that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." Dennis v. United States, 384 U.S. 855, 870, 86 S.Ct. 1840, 1849, 16 L.Ed.2d 973 (1966).

The "peculiar reason" standard used by the judge is evocative of the "particularized need" standard that this court expressly repudiated more than a month before this trial in an opinion noting it had really been superseded by *Dennis. See* Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968). In *Allen* we adopted a semblance-of-need standard, a test more than met in circumstances of the case before us.

 As to Agent MacCabe, the trial judge indicated there was less need for production of grand jury minutes of his testimony since he was only a secondary witness reporting on statements of others. On the contrary, as we have noted in *Allen,* grand jury minutes should be even more readily available in the case of the testimony of a police official. As events turned out, there were not insignificant aspects in which MacCabe's testimony of what defendant told him differed from the testimony defendant was to give later.[1]

The ruling on timeliness raises certain administrative problems confronting the trial court. We need not consider the issue directly since the case must be remanded for new trial in any event. At a new trial defendant would be entitled to the grand jury minutes of the testimony of these witnesses.

B. *Error from Failure To Cope with Prejudice Injected by Prosecutor's Improper Rebuttal Summation.*

As the last item of business in the afternoon prior to the charge to the jury, the prosecutor injected into his closing argument this note: "You can believe that he [defendant] had possession of this checkwriter in his own apartment and that he printed these figures on these checks. All we know about Jimmy is what he tells us. There is no verification of Jimmy. * * * Jimmy hasn't been called to testify, * * * He [defendant] wants you to acquit him based on his own version without any support in the facts."

It cannot be gainsaid that this summation, set out more fully in the footnote, was effective.[2] Defendant's account was certainly unusual, or as prosecutor put it "bizarre and fantastic." It hinged for exculpation on a Jimmy whose existence was never independently established. The prosecutor suggested that there were no facts to corroborate either that there was a Jimmy or that he was in any way implicated in preparing forged checks on the check-writing machine stolen from Scott.

---

1. Thus MacCabe said defendant told him he shared the proceeds with Jimmy 50–50. Defendant denied this, saying he gave all the money to Jimmy, and all he received from Jimmy was enough to accompany Jimmy in food and drink.

2. Of course, now this business about Jimmy, that's his version of what happened.

 According to the Government's evidence, this defendant, without any Jimmy, walked into these places and cashed these checks having endorsed the checks in his own name.

 \* \* \* \* \*

 Of course, you can believe his story about this Jimmy if you want to but, on the other hand, you don't have to believe his story. You can believe that he had possession of this checkwriter in his own apartment and that he printed these figures on these checks.

 All we know about Jimmy is what he tells us. There is no verification of Jimmy. There is no verification of any of these other people he mentioned. How about the two girls that he claims they were with all this time? Lorraine and Sadie, I believe were their names. We don't know anything about them. They haven't been called to testify. Jimmy hasn't been called to testify.

 This is what the defendant is telling you without any corroboration or any verification of any kind.

 You know he has an interest in getting you to believe his story because he wants you to acquit him. But he wants you to acquit him based on his own version without any support in the facts.

 So, ladies and gentlemen of the jury, be very cautious about this.

Defense counsel moved at the beginning of proceedings the next morning that the judge reopen closing arguments [3] so that he could make a rebuttal to the prosecutor's contention that defense could have brought in "this so-called Jimmy who the prosecutor argued might be nonexistent. I know that the prosecutor knows that this man [Jimmy] has been convicted for writing Scott Motors checks and I feel that it has prejudiced the defense."

■ There can be no doubt of the manifest impropriety of the prosecutor's references to "Jimmy"—in view of his knowledge that James Fowler had pleaded guilty in the same United States District Court to interstate transportation of checks, purportedly drawn on the Wil-

mington Trust Co. by David Scott, that had been forged.[4]

The impropriety of the prosecutor stands in contrast to the careful conduct of defense counsel who refrained from the tactic of subpoenaing a witness he knew would plead the privilege against self-incrimination.[5]

■ We have expressly outlawed comment (and of course instruction) on absent witnesses which would have the effect of suggesting that an inference be drawn against a defendant because he failed to call to the stand a witness who would have to incriminate himself.[6]

The prosecutor's attempt at justification is indeed lame.[7] His action would have been improper if he had concealed

3. In the alternative, defense counsel moved for mistrial or for a corrective instruction.

4. The file of United States v. Fowler, Crim. # 1555-67 shows that the guilty plea was entered December 29, 1967—two months before the trial of Bradley. The indictment relates to other Scott Motor checks which were passed in Virginia, also, we note, in the amount of $52.40.

 The sentencing files indicate that Fowler was sentenced by order of another judge filed July 8, 1968, to 3 to 9 years, suspended, with 3 years probation. (Crim. 1555-67).

5. Lawyer's Role in the Adversary System § 7.6(a) (Proposed Draft, Dec. 1968), American Bar Association Project on Minimum Standards for Criminal Justice; cf. Fletcher v. United States, 118 U.S.App.D.C. 137, 139, 332 F.2d 724, 726 (1964).

6. Pennewell v. United States, 122 U.S. App.D.C. 332, 353 F.2d 870 (1965). See also Gass v. United States, 135 U.S.App. D.C. 11, 416 F.2d 767 (Jan. 29, 1969); Wynn v. United States, 130 U.S.App. D.C. 60, 397 F.2d 621 (1967); Smith v. United States, 119 U.S.App.D.C. 22, 336 F.2d 941 (1964).

7. THE COURT: I think under the circumstances, he is entitled to some sort of an instruction to the jury. I didn't know who Fowler was until you told me a few minutes ago. If I had known that Fowler was in jail and was available, I would have jumped on you when you made that comment.
 PROSECUTOR: Well, counsel knew that he was in jail. All I said to the jury was that he was not produced.
 THE COURT: No, you went a little bit further.
 PROSECUTOR: As I recall it—
 THE COURT: You raised some kind of an issue as to whether he actually existed.

 \* \* \* \* \*

 PROSECUTOR: For the record, might I just state that I made no comment to the jury that they could make any inference of guilt from the failure of the defendant to produce any of these witnesses.
 THE COURT: I grant you that. I am not saying they could infer guilt, but they may possibly have this feeling that the defense should have produced these people to corroborate their man and so forth. The reason they didn't do it is they were afraid to.
 PROSECUTOR: Well, of course, there is nothing wrong with subpoenaing or bringing the individual Fowler to court and having him testify out of the presence of the jury as to whether or not he would testify—
 THE COURT: The fact remains he wasn't brought in.
 PROSECUTOR: That is true.
 THE COURT: Now the jury possibly could draw the inference that the reason he wasn't brought in is that he is either just a mythical character or if he were brought in, he would testify the wrong way and might be harmful to the defense.

Fowler's confinement from defense counsel. How is the prejudice lessened if defense counsel knew of the imprisonment of Fowler but was unable to counter prosecutor's suggestive rebuttal argument to the jury that Fowler had not been produced? The prosecutor said defense counsel could have called James Fowler to the stand out of the presence of the jury. How would that have avoided prejudice from the comment made to the jury?

The mere fact that a prosecutor has stumbled need not require a mistrial. We have approved the action of a judge who sought to retrieve the situation effectively by admonishing the jury at once, without waiting for his formal instruction, to disregard the prosecutor's comment.[8] Prejudice may particularly be avoided if the judge steps in on his own initiative.[9]

The remedial action taken by the trial judge in this case, however, consisted only of the statement in the instructions to the jury that the jury was not to draw any inference of guilt from defense counsel's failure to call the girls or Fowler as a witness. That was enough with respect to the girls, but it was inadequate as to Fowler. More effective action by the judge was needed to undo the prejudice resulting from the prosecutor's impropriety.[10] Defense counsel requested opportunity to make a supplementary argument. That would have been appropriate, though we do not say it was necessary. The judge could have

coped with the problem by a forthright instruction advising the jury of the uncontested fact—of James Fowler's arrest and plea of guilty on a charge of transporting forged checks purportedly signed by Scott Motor Company—unavailable in evidence as such. The use of an instruction explaining the actual fact to the jury in a case when a vexing problem arises was approved in the opinion written by Judge Burger in Morrison v. United States, 124 U.S.App.D.C. 330, 333, 365 F.2d 521, 524 (1966).

### C. *The Instructions to the Jury.*

Defense counsel objected to two aspects of the court's instructions to the jury. We need not consider whether these by themselves constituted reversible error. We do think it appropriate to point out the merit of defense contentions in case there should be a new trial.

▇ The first issue relates to defendant's proposed instruction #1, Intent to Defraud and Guilty Knowledge. The judge marked the defense proposal "Granted in Substance," stating however that he did not like its "esoteric" language, and preferred clear language of the standard "red book"—a reference to the standardized Criminal Jury Instructions published by the Junior Bar Section. Defense counsel said he felt his proposed instructions were clearer and took an exception.

Defendant's proposed instruction contained language similar to that later used by the court.[11] But it contained important additional language. It stated that

---

8. Pennewell v. United States, *supra* note 6.

9. King v. United States, 125 U.S.App.D.C. 318, 331, 372 F.2d 383, 396 (1966).

10. *See* King v. United States, *supra*, 125 U.S.App.D.C. at 331, 372 F.2d at 396: "But where the case is close, prejudice cannot be avoided by 'mild judicial action,' and reversal is necessary to obviate the consequence of prosecutor's persistent departure from his 'duty to refrain from improper methods' to obtain conviction. Berger v. United States, 295 U.S. 78, 85, 88, 55 S.Ct. 629, 79 L.Ed. 1314 * * * (1935)."

11. The trial judge charged that it was necessary that defendant have the intent to defraud someone by passing the instrument and continued (Tr. 202–3):

Now, specific intent, as the term implies, means something more than just a general intent to commit an act. To establish specific intent, the Government must prove that the defendant knowingly did an act which the law forbids. Specific intent cannot ordinarily be proved directly because, as yet, we have no way of probing the operations of the human mind but intent may be deduced from all the facts and circumstances surrounding the case,

although guilty knowledge might be inferred if the accused had reason to believe the checks were forged, that was not controlling: "Conviction is not required if you believe the accused was merely negligent in uttering the check with respect to which the facts should have put him on guard."

The prosecutor cogently argued to the jury that there were circumstances that should have made defendant suspicious. Defense counsel argued that defendant might have been foolish or negligent, but this did not establish guilt. This was the core of the defense. A perceptive juror could have inferred that the court's expression of the need for finding specific intent to defraud as one element of the crime indicated that negligence was not enough, but we do not think that the point was clear, especially since the juror merely hears and does not read the instructions. In this case a clearer instruction would have been simple, and the issue was important enough, and the facts close enough, to call for an express instruction that negligence was insufficient to establish guilt.[12]

Compounding the problems of the court's failure to give a specific instruction on negligence was the inclusion of an instruction on drunkenness neither desired by the defense nor requested by the Government.[13] The point of the instruction was the relationship between drunkenness and guilty intent. Defense counsel had never suggested that drunkenness had rendered his client incapable of guilty intent. Instead he had argued that drunkenness had made his client uncritical and unsuspicious of Jimmy and his check-writing machine. In light of the court's failure to give a specific instruction that mere negligence was not enough to convict, the injection of the drunkenness issue might have left the jury with the misimpression that it had to ignore Bradley's drunkenness altogether unless it found that he was drunk beyond the ability to form a guilty intent.

Reversed and remanded.

TAMM, Circuit Judge, dissents.

---

from all the things done and all the things said. The intent to defraud is not to be presumed from the mere making or possession of a false instrument. It may be found on the basis of some affirmative act, such as, the passing or the attempting to pass the forged check or instrument or on the basis of other circumstances from which an inference might be inferred.

12. *See, e. g.*, Perez v. United States, 297 F.2d 12, 15–16 (5th Cir. 1961); Levine v. United States, 104 U.S.App.D.C. 281, 261 F.2d 747 (1958).

13. The trial judge charged (Tr. 206):
Now, there is some evidence in this case that the defendant was drinking rather heavily at or about the time these offenses are alleged to have taken place. Intoxication as such is not a defense. If the defendant was so heavily intoxicated as to be incapable of forming an intent—then it could be a valid defense because specific intent is an essential element of the crimes; but merely that he may have been drunk in the ordinary sense is not sufficient to constitute a defense to a crime requiring specific intent. To constitute a defense the accused must have been so drunk as to be incapable of forming an intent, so drunk as to be incapable of consciousness that he was committing the crime in question.