John HARRIS, Appellant,

v.

UNITED STATES, Appellee.

Robert Lee COSBY, Appellant,

v.

UNITED STATES, Appellee.

Nos. 79–653, 79–734.

District of Columbia Court of Appeals.

Argued Oct. 22, 1980.

Decided May 12, 1981.

**538**

Jeffrey Marshall Albert, Washington, D. C., appointed by the court, for appellant in No. 79–653.

Ted Kavrukov, Washington, D. C., appointed by the court, for appellant in No. 79–734.

Keith A. O'Donnell, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty., and John A. Terry and William D. Nussbaum, Asst. U. S. Attys., Washington, D. C., on brief, for appellee.

Before NEWMAN, Chief Judge, and GALLAGHER * and HARRIS, Associate Judges.

* Judge Gallagher's status became that of Associate Judge, Retired, on February 27, 1981.

HARRIS, Associate Judge:

Appellants were charged by information with the possession of narcotics in violation of D.C.Code 1973, § 33–402. They were convicted by a jury. They challenge their convictions principally upon the grounds of (1) alleged prosecutorial misconduct, and (2) the trial court's giving of two missing witness instructions. We affirm.

I

The government's evidence established that on July 18, 1978, Detective Larry Thomas, a plainclothes officer of the Drug Enforcement Unit, Metropolitan Police Department, was driving north on 12th Street in his personal car. He carried a packet of currency the serial numbers of which he had recorded previously. While in his car, Thomas was approached by a man whom he later identified as appellant Cosby, who asked if Thomas "wanted anything." They effected the sale of a single Dilaudid pill, agreeing (following some haggling) to a price of $32. After the price was set, appellant Cosby walked over to appellant Harris, who was standing about 20 feet away. The two men entered a garage. Appellant Cosby emerged from the garage first and handed Thomas the Dilaudid pill. Appellant Harris stepped back out of the garage and stood on the sidewalk. Thomas paid appellant Cosby $32 in marked bills. Thomas saw appellant Cosby then give the money to appellant Harris.

After completing the deal, Thomas drove to a prearranged location to meet with other members of his unit. He provided them with a description of appellants and with an account of what had transpired. Within minutes the other detectives located appellants and placed them under arrest. The police seized $30 from appellant Harris which later was determined to be the same money with which Thomas had purchased the Dilaudid tablet.[1] Thomas then drove past the scene of the

1. The discrepancy between the $32 purchase price and the $30 recovered from appellant Harris never was explained.

arrests and confirmed the identity of the two men as the same ones with whom he had just dealt.[2]

At trial, both appellants denied any involvement in a drug transaction. Appellant Cosby testified that Thomas had a grudge against him because of several earlier encounters. Appellant Cosby further stated that he was in the neighborhood on the day he was arrested in order to talk to a "reverend" about painting a church and that the clergyman was standing with him when the arrest occurred.

Appellant Harris testified that he was in the area because he was waiting for his brother, "Cornbread" Harris, to return with a tow truck. He indicated that a friend of his had asked him to watch over the garage. In explaining his possession of the marked currency, appellant Harris recalled that someone he did not know had handed him $50 about ten minutes before he was arrested, telling him to deliver the money to his brother.

After the close of the evidence, the prosecutor and defense counsel presented their final arguments. The prosecutor made several comments in his closing argument which prompted objections from appellants' counsel. Drawing upon expert testimony which had been presented on the technique of selling drugs known as "juggling," by which the holder of the drugs remains aloof from the solicitor of the sale,[3] the prosecutor characterized appellant Harris' involvement as follows:

And who pays him [appellant Cosby], the holder. The man who doesn't come out and meet the people. The man who tries to stay in the background. Got to be close enough by to pass the pill along, but tries to stay away, stays kind of out of [the] chain, kind of the way the Mafia works, ladies and gentlemen. Where nobody can get to the real godfather.

On cross-examination, appellant Cosby's credibility was impeached by testimony as to his previous convictions for petit larceny, attempted burglary, and receiving stolen property.[4] During his rebuttal, the prosecutor reminded the jury of those convictions:

As the Judge will instruct you, those convictions for petit larceny, the receiving of stolen property are not introduced to tell you that Mr. Cosby's a drug user. We don't have to do that, he told you that. They're introduced, evidence that he's a thief, is introduced to tell you that he's not the kind of man you should believe when he gets up on the witness stand. That's why the testimony is introduced.

Appellants' counsel objected to these statements and moved for a mistrial. The trial court denied the motion, but permitted all counsel to make further arguments.

■ In addition to its general instructions, the trial court gave the jury a missing witness instruction as to the clergyman with whom appellant Cosby allegedly had

---

**2.** At trial, the government proffered and the court admitted into evidence a heat-sealed envelope containing the Dilaudid tablet which Thomas said appellant Cosby had sold to him. The document attached to the exhibit was marked only with the name of appellant Harris, who objected to the exhibit's receipt as evidence. He contends that the trial court's admission into evidence of the exhibit constitutes reversible error because of its low probative value and its highly prejudicial effect. We find no error in the exhibit's introduction. The tablet certainly was probative of the offense of possession. Thomas explained at trial the common police practice of listing on an exhibit only one defendant's name in a case involving codefendants because of the limited space provided on the police forms. This testimony, coupled with the extensive and detailed testi-

mony about both appellants' involvement in the offense, persuades us that the trial court's admission of the exhibit as marked was not an abuse of its discretion or so inherently prejudicial as to constitute reversible error. *See (Michael) Smith v. United States*, D.C.App., 389 A.2d 1356, 1359–60, *cert. denied*, 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 707 (1978).

**3.** This method of conducting business seeks to separate the possession of the drug from the intent to sell it, as well as to reduce the likelihood of the solicitor's being robbed.

**4.** Cosby testified that he had three convictions for petit larceny and that he had pleaded guilty once to attempted burglary and twice to receiving stolen property.

**540**

been and as to appellant Harris' brother.[5] Appellants' counsel argued against and objected to the giving of the missing witness instructions.[6] The jury returned guilty verdicts against both appellants.

## II

The prosecutor's analogy to the Mafia in his closing argument might better have been left unsaid. However, such a comment does not necessarily rise to the level of prejudice mandating reversal. *Sel-*

**5.** The court instructed the jury as follows:

If you find that a witness who could have given material testimony on an issue in this case was peculiarly within the power of one party to produce [but] was not produced by that party and his absence has not been sufficiently accounted for or explained, then you may, if you deem it appropriate, infer that the testimony of the witness would have been unfavorable to the party which failed to produce him.

However, no such inference should be drawn by you with regard to a witness who was equally within the power of either party to produce or whose testimony would have been merely cumulative or immaterial.

**6.** The trial court also gave an aiding and abetting instruction as to appellant Harris, stating:

You may find the defendant guilty of the crime charged in the information, that is, possession of a narcotic drug, without finding that he personally committed each of the acts constituting the offense, or that he was personally present at the commission of the offense.

Any person who advises, incites or connives at an offense, or aids or abets the principal offender, is therefore punishable as a principal, that is, he is as guilty of the offense as if he had personally committed each of the acts constituting the offense.

A person aids and abets another in the commission of a crime if he knowingly associates himself in some way with the criminal venture, with the intent to commit the crime, participates in it as something he wishes to bring about, and seeks by some action of his to make it succeed.

Some conduct by the defendant of an affirmative character in furtherance of a common criminal design or purpose is necessary. Mere physical presence of a defendant at the time and place of the commission of an offense is not by itself sufficient to establish his guilt. However, mere presence would be enough if it is intended to and does aid the primary actor.

\* \* \* \* \* \*

*lars v. United States*, D.C.App., 401 A.2d 974, 978 (1979); *Evans v. United States*, D.C.App., 392 A.2d 1015, 1026 (1978); *United States v. Jenkins*, 140 U.S.App.D.C. 392, 436 F.2d 140 (1970); *Taylor v. United States*, 134 U.S.App.D.C. 188, 413 F.2d 1095 (1969). Under our standard of review,

[a]n appellant is entitled to a new trial based upon prosecutorial misconduct only if, after balancing the gravity of the prosecutorial misconduct against the weight of the evidence against appellant, we are unable to say that the conduct did

It is not necessary that any specific time or mode of committing the offense shall have been advised or commanded, or that it shall have been committed in the particular way instigated or agreed upon. Nor is it necessary that there shall have been any direct communication between the actual perpetrator and the defendant.

Now the Court further instructs you that in order for you to find that Mr. Harris aided and abetted Mr. Cosby in his possession—remember, we're not talking about any sale—we're talking about possession, the Court further instructs you that in order to find that Mr. Harris aided and abetted Mr. Cosby in his possession of a narcotic drug, that is, the dilaudid pill, you must find beyond a reasonable doubt both of the following: That Mr. Cosby had possession of the dilaudid pill at the time in question, and that Mr. Harris passed possession of the dilaudid pill to Mr. Cosby, or caused it to be passed to Mr. Cosby, at some time prior to the incident in question.

Appellant Harris' counsel objected to the instruction and maintains on appeal that the instruction permitted the jury to find appellant Harris guilty of possession even if it found that he acted without the necessary guilty knowledge. We reject this contention. The trial court's instruction clearly characterized an aider and abettor as one who "*knowingly* associates himself in some way with the criminal venture." (Emphasis supplied.) Moreover, in its general instructions to the jury on intent, the trial court explained the requisite guilty knowledge associated with the charge:

You may find that the defendant knowingly and intentionally possessed the narcotic drug if he did so consciously, voluntarily and purposely, and not because of mistake, inadvertence or accident.

Having received these instructions, the jury was fully apprised of the necessity of finding that appellant Harris acted with guilty knowledge before it could return a guilty verdict against him.

not substantially sway the judgment of the jury.

*Sellars v. United States, supra,* 401 A.2d at 978; *see Miles v. United States,* D.C.App., 374 A.2d 278, 284 n.9 (1977). The decisive factors in assessing the impact of questionable prosecutorial remarks "are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Gaither v. United States,* 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (footnotes omitted). Our inquiry focuses on the strength of the government's case in determining the amount of prejudice caused by a potentially inflammatory remark. *United States v. Jones,* 157 U.S.App.D.C. 158, 165–66, 482 F.2d 747, 754–55 (1973). Here the government had a strong case against appellants for possession of a narcotic—an undercover policeman's eyewitness testimony as to the drug sale, the Dilaudid tablet which was received from appellants, and the marked money used for the drug buy which was recovered from appellant Harris at the time of his arrest. Detective Marcum had supplied expert testimony as to local drug dealers' penchant for working in covert teams. It was upon that testimony that the prosecutor based his Mafia comparison, which in any event was tangential to the direct evidence in the case. The trial judge instructed the jury that statements and arguments of counsel were not evidence. Given the strength of the government's case, and viewing the Mafia reference in the context of the entire argument, we are satisfied that the prosecutor's remark did not affect the verdict.

 For similar reasons we find that the prosecutor's "thief" remark did not amount to misconduct warranting reversal. Such prosecutorial remarks, which serve "only to blur the already murky distinction which the jury must draw between the use of evidence of prior crimes as a reflection of credibility and the use of such evidence as a denotation of criminal character," *Evans v. United States, supra,* 391 A.2d at 1026, are to be avoided. We have condemned like comments in the past without requiring reversal. *Maxwell v. United States,* D.C. App., 297 A.2d 771, 773 (1972), *cert. denied,* 412 U.S. 921, 93 S.Ct. 2740, 37 L.Ed.2d 147 (1973) (prosecutor's characterization of defendant as "[b]urglar, thief, robber," although improper, did not necessitate reversal); *see Evans v. United States, supra,* 392 A.2d at 1026 (reference to defendants as "a gang of felons," even though improper and offensive, did not compel reversal); *Smith v. United States,* D.C.App., 315 A.2d 163, 166, *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974) (referring to defendants as "killers," "warriors," "gangsters" did not rise to level of substantial prejudice); *United States v. Jones, supra,* 157 U.S.App.D.C. at 164, 482 F.2d at 753 (use of term "executioner" to characterize defendant, while not condoned, did not warrant reversal). In light of appellant Cosby's own testimony as to his convictions, the prosecutor's statement (in connection with the "thief" remark) to the effect that appellant Cosby's prior convictions reflected solely on his credibility, and the trial judge's cautionary instruction to the jury on not drawing any inference of guilt against the defendant from his prior convictions, we conclude that any possible error stemming from the comment was harmless.[7]

---

7. Appellants also objected to the prosecutor's statement to the jury at the start of his rebuttal: "Ladies and gentlemen, you had a lot of smoke blown at you this afternoon." Appellants contend that this remark amounts to impermissible comment on appellants' counsel's honesty and to prosecutorial misconduct necessitating reversal. However, we find this assertion meritless. The statement was but a passing reference, quite minor in the context of the prosecutor's entire rebuttal. We are confident that the "smoke" remark had no lasting effect and "did not substantially sway the judgment of the jury." *Sellars v. United States, supra,* 401 A.2d at 978.

Finally, appellants objected to the prosecutor's mischaracterization of a portion of appellant Harris' attorney's opening statement. In his rebuttal, the prosecutor said:

And what did [Harris' counsel] tell you she expected to prove? She expected to prove that, yes, Harris got money and that Cosby gave it to him, for Cornbread. That Cosby gave Harris money for Cornbread.

## III

Both appellants challenge the trial court's giving of missing witness instructions pertaining to the "reverend" and to "Cornbread" Harris. The instruction is permissible where "an inference of unfavorable testimony from an absent witness is a natural and reasonable one." *Burgess v. United States*, 142 U.S.App.D.C. 198, 206, 440 F.2d 226, 234 (1970); *see* 2 Wigmore, Evidence § 286 (Chadbourn rev. 1979). Consistent with the theory underlying the adverse inference, two conditions must be satisfied before a trial judge may instruct the jury on a missing witness: (1) the witness' testimony must be likely to elucidate the transaction at issue, and (2) the witness must be peculiarly available to the party who failed to call him. *Dent v. United States*, D.C.App., 404 A.2d 165, 169–70 (1979); *Conyers v. United States*, D.C.App., 309 A.2d 309, 312–13 (1973), quoting from *United States v. Young*, 150 U.S.App.D.C. 98, 103–04, 463 F.2d 934, 939–40 (1972); *Wynn v. United States*, 130 U.S.App.D.C. 60, 64, 397 F.2d 621, 625 (1967). Whether these two prerequisites have been met is a factual determination for the trial judge. *Dent v. United States, supra,* 404 A.2d at 171; *Shelton v. United States*, D.C.App., 388 A.2d 859, 863 (1978). Thus the trial court has considerable discretion in ascertaining the appropriateness of a missing witness instruction. *Dent v. United States, supra; Shelton v. United States, supra; (Kenneth) Smith v. United States*, D.C.

App., 343 A.2d 40, 44 (1975), quoting from *United States v. Craven*, 147 U.S.App.D.C. 383, 386, 458 F.2d 802, 805 (1972).

Appellant Cosby maintains that the trial court committed reversible error by giving the missing witness instruction as to the unnamed "reverend" with whom he allegedly was conversing at the time of his arrest.[8] In his brief, Cosby specifically "concedes that the reverend would have been able to elucidate the transaction, for purposes of the missing witness instruction." Cosby contends only that the reverend was not peculiarly available to him. We disagree.

Cosby points to his testimony regarding his unsuccessful efforts to locate the reverend as evidence of his powerlessness to produce the alleged minister at trial. On the stand Cosby indicated that he did not know the reverend's name even though he had an appointment with him. He testified that he knew the location (but not the name) of the reverend's church, the reverend's phone number, and the identity (but not the license plate number) of the reverend's car. In describing his efforts to track down the reverend, Cosby said he had "been past [the church]," although he never knocked on the door. Additionally, he had "[b]een trying to call [the reverend]," but the "[p]hone rang busy . . . [a]ll the time."

If there is evidence in the record that the party has made a bona fide effort to find the witness, the missing witness instruction should not be given. *Shelton v. United States, supra,* 388 A.2d at 865;

However, what counsel actually had said was that some unknown person had given Harris the money.

> He [appellant Harris] will testify he received some money from a man on the street for his brother . . . . The person from whom he received the money happened to be one of those people that he doesn't know the name of, but that doesn't mean he doesn't know the person.

To rectify the situation, the court told the jury that it recalled that the prosecutor had mischaracterized the opening statement and then permitted counsel to elaborate further on the matter. Given the curative steps taken by the court, we find that the prosecutor's remarks, even assuming arguendo that they injected error, were not so prejudicial as to require reversal. *Sellars v. United States, supra;*

*see King v. United States*, 125 U.S.App.D.C. 318, 330, 372 F.2d 383, 395 (1967); *Corley v. United States*, 124 U.S.App.D.C. 351, 354, 365 F.2d 884, 887 (1966); *cf. Bradley v. United States*, 136 U.S.App.D.C. 339, 345, 420 F.2d 181, 187 (1969) (supplementary argument would have been appropriate).

8. Cosby's testimony reflects inconsistencies as to where the reverend was located in relation to him. While described as "standing behind him [appellant Cosby]," "standing in the yard of the church" with Cosby "standing on the sidewalk," the reverend apparently was positioned on the opposite side of a fence from appellant; nonetheless, Cosby testified that he knew the time of his arrest because he was able to see the reverend's watch.

*Nowlin v. United States,* D.C.App., 382 A.2d 9, 13 (1978); *United States v. Dixon,* 152 U.S.App.D.C. 200, 202 n.4, 469 F.2d 940, 942 n.4 (1972). The trial judge is required to make an "informed decision" on an absent witness' availability. *Stewart v. United States,* 135 U.S.App.D.C. 274, 278, 418 F.2d 1110, 1114 (1969). In making the determination that the absent witness was available to Cosby, the court had before it Cosby's testimony about the supposed reverend. Neither the judge nor the jury was bound to accept the testimony at face value, especially where, as here, "[a] reading of the transcript is convincing of the inherent improbability of appellant's position." *United States v. Craven, supra,* 147 U.S.App.D.C. at 386, 458 F.2d at 805. We find the evidence sufficient to support the giving of the instruction. *See Nowlin v. United States, supra,* 382 A.2d at 13; *United States v. Scott,* 150 U.S.App.D.C. 323, 325–26, 464 F.2d 832, 834–35 (1972).

▮ Appellant Harris contends that the giving of the missing witness instruction as to his brother "Cornbread" constituted reversible error because Cornbread could not have elucidated the transaction.[9] Harris testified that he was at the scene of his arrest in part to wait for his brother and to answer the telephone at the garage at his brother's request. Harris referred to Cornbread in accounting for his own presence in the neighborhood and to justify his possession of the marked police currency.

▮ While it is true that Cornbread's testimony could not have shed light on appellant Harris' alleged drug possession, the offense with which Harris was charged, he could have provided testimony on an issue in the case—Harris' presence in the neighborhood. *Compare Finnegan v. United States,* D.C.App., 399 A.2d 570 (1979), *with Haynes v. United States,* D.C.App., 318 A.2d 901 (1974). "A missing witness need not be an eyewitness to the alleged offense in order to be able to elucidate the transaction." *Finnegan v. United States, supra,* at 572. The missing witness instruction describes the witness as one who would offer material testimony on an issue in the case. *See* note 5, *supra; Finnegan v. United States, supra,* at 573. Cornbread fits that description.[10] Cornbread allegedly could have corroborated appellant Harris' account of his innocent presence in the area, a place where undercover policemen journeyed specifically to make narcotics purchases which was a known "regular beat" for Dilaudid. Because no other witness testified in support of Harris' alibi defense, Cornbread would have supplied superior, non-cumulative testimony. *See Cooper v. United States,* D.C.App., 415 A.2d 528, 534 (1980) (missing witness instruction erroneously given where witness' testimony, because cumulative, could not elucidate an issue in the case.) The trial judge did not err in concluding that Cornbread's testimony could have elucidated the transaction; we find no error in the missing witness instruction's having been given as to him.[11]

9. Harris does not contest his ability to produce Cornbread. He does argue that Cornbread's testimony about the marked police currency would have tended to incriminate him; if Cornbread were to have claimed the privilege against self-incrimination when called to testify, he would not have been considered available to either party. *Anderson v. United States,* D.C.App., 352 A.2d 392, 394 n.3 (1976); *Carver v. United States,* D.C.App., 312 A.2d 773, 775 (1973); *see Bowles v. United States,* 142 U.S. App.D.C. 26, 32, 439 F.2d 536, 542 (1970) (en banc), *cert. denied,* 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971). However, the privilege does not apply to Cornbread. Appellant Harris testified that some unknown man handed him the marked currency, saying it was for Cornbread. According to his story, the money, al-

though intended to end up in Cornbread's possession, neither came from nor found its way to Cornbread. Consequently, Cornbread's testimony concerning the money was not subject to a Fifth Amendment claim of privilege, and he was available as a witness.

10. The trial court specifically found that Cornbread "would have elucidated a matter in issue and would have been important, and therefore, material."

11. The record before us demonstrates that the trial judge was both deliberate and selective in his evaluation of requests for the missing witness instruction. He denied three additional government proposals that the instruction be given as to the other individuals who allegedly

Finding no reversible error, we sustain appellants' convictions.

*Affirmed.*

NEWMAN, Chief Judge, dissenting in part and concurring in part:

I dissent because I believe that the missing witness instruction was unwarranted with respect to either the Reverend or Conrad "Cornbread" Harris. In the case of appellant Cosby, because Cosby's credibility was critical to his case, and because the missing witness instruction tended to undercut his credibility, the verdict of the trial court should, in my opinion, be reversed and the case remanded for a new trial. With respect to appellant Harris, as there was substantial independent evidence to support the conviction of possession, I conclude that the missing witness instruction, although erroneously given, was harmless. I agree with my colleagues that the prosecutorial misconduct in this case did not rise to the level of prejudice mandating reversal, and therefore concur in the affirmance of appellant Harris' conviction.

Appellant Cosby argued at trial that this was a case of mistaken identity. He testified that he had not been acquainted with appellant Harris prior to his arrest in this case, and that on July 18, 1978, he was in the neighborhood of Twelfth and T Streets to discuss painting the front of the church at that location with a Reverend of the church.

Cosby's argument of misidentification was buttressed by the discrepancy between Detective Thomas' description of the person with whom he had negotiated the sale, which description he gave to the detectives who executed the arrest, and Cosby's own appearance. After making his purchase Thomas drove to a prearranged post where he described the Dilaudid seller to Black and Swope as five feet nine inches tall, weighing one hundred forty-five pounds, and wearing blue slacks and a plaid or print shirt with pink in it, without any mention of the seller's race. Appellant Harris later testified that he had received money from a slim man whose height he estimated at five feet nine or ten inches and whose weight he guessed to be one hundred fifty or one hundred sixty pounds. He stated positively that he had not received money from appellant Cosby. Cosby, by contrast, is five feet four inches tall. He weighed one hundred twenty-one pounds at the time of the trial, and testified that at the time of the incident in question he had weighed only one hundred fourteen or one hundred fifteen pounds. On the day of the arrest he wore blue slacks and a blue plaid shirt with dark brown checks.

Prior to trial Cosby attempted to locate the Reverend to testify in his behalf. He knew neither the Reverend's name, nor his home address or telephone number. He tried without success to reach the Reverend by telephoning a number at the church which continually rang busy. He passed the church on a number of occasions but did not knock because the church door was locked and the Reverend's car, which he knew by sight, was not in the vicinity.

"[I]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893). This rule endures in the District of Columbia, where it is expressed to jurors in the form of the "missing witness instruction." [1] *See, e. g., Cooper v. United States,* D.C.App., 415 A.2d 528, 533 (1980); *Dent v. United States,* D.C.App., 404 A.2d 165, 169 (1979); *Coombs v. United States,* D.C.App., 399 A.2d 1313, 1316 (1979). As we observed in *Dent v. United States, supra* at 170–71, the practical effect of the missing witness instruction, which allows the jury to draw an inference adverse to a party from the absence of evidence, is to

were involved with appellants on the day of the arrest.

1. For the text of the instruction that was read to the jury in the instant case, *see* note 5, *supra* at p. 545 of the majority opinion.

create evidence from non-evidence. Unlike other evidence, though, as the inference is permitted only because of the absence of specific testimonial evidence, "the circumstances bearing on the import of this non-evidence are unlikely to come out at trial." *Givens v. United States*, D.C.App., 385 A.2d 24, 26 (1978). Inherent in the use of the missing witness instruction is thus the danger that the adverse inference "may add a fictitious weight to one side of the case, for example, by giving the missing witness undeserved significance." *Dent v. United States, supra* at 171. *See also Cooper v. United States, supra* at 533.

To curtail this and other potentially prejudicial ramifications of the missing witness doctrine,[2] courts carefully restrict application of the doctrine "to situations where it is 'peculiarly within' the party's 'power to produce' the witness and where, as well, the witness' testimony 'would elucidate the transaction.'" *Wynn v. United States*, 130 U.S.App.D.C. 60, 64, 397 F.2d 621, 625 (1967) (footnotes omitted); *accord, Cooper v. United States, supra* at 533; *Dent v. United States, supra* at 169–70. As the majority correctly notes, the factual determination of whether these prerequisites are met is entrusted in the first instance to the trial court. "Consequently, the trial court has considerable latitude in determining 'whether from all the circumstances an inference of unfavorable testimony from an absent witness is a natural and reasonable one.'" *Shelton v. United States*, D.C.App., 388 A.2d 859, 863 (1978) (quoting *Burgess v. United States*, 142 U.S.App.D.C. 198, 206 & n.11, 440 F.2d 226, 234 & n.11 (1970) (per Fahy, Senior Circuit Judge, with two circuit judges concurring in the result)). The "considerable latitude" allowed the trial court in making this determination is not, however, without limit. We have regularly scrutinized the rulings of trial courts with respect to the missing witness doctrine to ascertain whether there has been an abuse of discretion. *See, e. g., Cooper v. United States, supra* at 534; *Coombs v. United*

*States, supra* at 1317–18; *Shelton v. United States, supra* at 865.

We have previously considered significant the relationship between the party and the missing witness with respect to whom the doctrine is invoked. We have said:

> The availability of a witness to any party "must be judged 'practically as well as physically.'" *United States v. Young*, 150 U.S.App.D.C. 98, 106, 463 F.2d 934, 942 (1972), *quoting Stewart v. United States*, 135 U.S.App.D.C. 274, 279, 418 F.2d 1110, 1115 (1969). The court in *Young* also commented that "whether a person is to be regarded as equally available to both sides may depend not only on physical availability but on his 'relationship' to the parties." *Id.* 150 U.S.App. D.C. at 106, 463 F.2d at 942. [*Hale v. United States*, D.C.App., 361 A.2d 212, 216 (1976).]

In *Hale v. United States*, the appellant had "identified the [missing] witness as his girl friend, thus establishing a close relationship between the parties." *Id.* The appellant in *Hale* was accused of assault with a dangerous weapon and of carrying a pistol without a license. The missing witness had previously testified before a grand jury that the appellant had shot the complainant in self-defense. On these facts the "inference of unfavorable testimony [was found] a natural and reasonable one," *id.* (quoting *United States v. Young, supra* at 107, 463 F.2d at 943), and the giving of the missing witness instruction was not error. The contrast between *Hale* and the instant case is apparent. Here, the relationship between appellant Cosby and the Reverend, whose name, address, and telephone number Cosby did not know, was remote at best.

Furthermore, if there is evidence in the record to indicate that a party has made a bona fide effort to locate a witness, the missing witness instruction should not be given. *Shelton v. United States, supra* at 865. Such an effort may be neither exhaus-

---

2. The ways in which a jury may be misled and the weight of the evidence distorted by use of the missing witness inference are discussed at

greater length in *Dent v. United States, supra* at 170–71.

tive nor successful, and yet may suffice to remove the spectre of the missing witness doctrine. In *Nowlin v. United States,* D.C. App., 382 A.2d 9 (1978), the government had been aware of the existence of a witness for a substantial period of time, but "did not attempt to locate him until one day before trial, and then only by a scan of correctional institutions in the Washington area." *Id.* at 13. In *Nowlin* we held that where "the last name of the witness was not certain, his address was unknown, and the government exhausted the only lead it had as to his whereabouts," the court had properly refused to give the missing witness instruction. *Id.*

Evidence in the record indicates that Cosby's efforts to locate the Reverend were at least as extensive as the government's efforts to locate the missing witness in *Nowlin v. United States, supra.* As discussed above, by use of the missing witness instruction the weight of the evidence is potentially distorted; evidence is created from non-evidence; and thus, where the instruction is given to the defendant's detriment, the cornerstone of the common law, the presumption of innocence, may be jeopardized. The trial court erred in finding that the Reverend was peculiarly within Cosby's power to produce.

Moreover, the Reverend could not have elucidated the transaction at issue. The issue in the case was whether appellant Cosby, acting as a "juggler," had possessed narcotics. No evidence was adduced or argument made that the Reverend had any connection with or knowledge of the alleged drug trafficking. If called to testify, the Reverend could at most have testified to a reason for Cosby's presence in the neighborhood of Twelfth and T Streets at the time of the arrest. Cosby's presence at the scene was not controverted.

"Not every absent but producible witness who can be held to have some knowledge of the facts need by reason of *Graves* be made the subject of the 'presumption.'" *Burgess v. United States, supra* at 205, 440 F.2d at 233 (footnote omitted). The jury may be permitted to infer that a missing witness, if called, would give testimony disadvantageous to the defendant, solely when both prongs of the missing witness test are met: "(1) ... the witness [must be] peculiarly within the power of the party to produce, and (2) ... the witness' testimony [must be] likely to elucidate the transaction in issue. If either condition is not present then '[b]oth comment by counsel and instruction by the judge ... is prohibited.'" *Dent v. United States, supra* at 169–70 (quoting *Conyers v. United States,* D.C. App., 309 A.2d 309, 312–13 (1973)). In *Dyson v. United States,* D.C.App., 418 A.2d 127 (1980), where the testimony of the appellant's friends "[a]t most ... could only have corroborated his testimony that he was with them at that time," *id.* at 131, and would have shed no light on whether or not the appellant had committed the breaking and entering of which he was accused, we held that the prosecutor's remarks to the jury on the appellant's failure to call those witnesses to testify were "improper as they permitted the jury to draw the erroneous inference that the missing witnesses' testimony would elucidate the transaction." *Id.* *Dyson,* I submit, is essentially indistinguishable from the instant case: the Reverend stood in a position in relation to Cosby, with respect to his inability to elucidate the transaction, identical to the position of the appellant's friends in *Dyson.*

Although substantial circumstantial evidence was adduced at trial indicating that Cosby had been misidentified as the Dilaudid seller, Cosby's own testimony was the primary evidence arguing in favor of his innocence. The sole evidence tying Cosby to the crime was the testimony of Detective Thomas that Cosby was the "juggler." The case thus turned largely on credibility.

We have previously held that where the missing witness instruction was erroneously given or the doctrine erroneously argued by the prosecution, and the credibility of the defendant was crucial to his case, the error was prejudicial and mandated reversal. *Coombs v. United States, supra* at 1318; *Haynes v. United States,* D.C.App., 318 A.2d 901, 903 (1974). *See also Brown v.*

*United States*, 134 U.S.App.D.C. 269, 272, 414 F.2d 1165, 1168 (1969). Since I cannot conclude that the error here was "harmless," *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946),[3] the conviction should be reversed.

Appellant Harris likewise denied involvement in drug trafficking. He testified that approximately a minute before he was arrested he received fifty dollars from someone whose name he did now know, with instructions that he should deliver the money to his brother, Conrad "Cornbread" Harris, and stated that upon receipt thereof he had counted the money and commingled it with his own. He also testified that he was waiting and taking phone messages for his brother when he was arrested. Harris raised a timely objection below, and contends on appeal that the missing witness instruction was improperly given with respect to his brother because Conrad could not have elucidated the transaction at issue.

Harris was charged with and convicted of the possession of narcotics. As in the case of the Reverend, Conrad, if called as a witness, might have been able to corroborate Harris' testimony as to why he was in the neighborhood. While Conrad might have been able to shed further light on the fifty dollar payment Harris testified he had received prior to the arrest, even here it is unclear that Conrad would thus have elucidated the transaction at issue: due to Harris' own testimony that upon receipt thereof he had commingled the fifty dollars with other money he possessed at the time, it is purely speculative that the thirty dollars in marked bills later found on Harris' person were included among the fifty dollars Harris claimed to have received on behalf of Conrad.

As in the case of the Reverend, Conrad's ability merely to corroborate Harris' own explanation for his presence in the neighborhood did not justify the giving of the missing witness instruction. Nor was the trial court justified in giving the instruction on the basis of the unsubstantiated possibility that Conrad might have had some knowledge of the transaction at issue through his connection with thirty dollars in marked bills, which may or may not have been included in a fifty dollar payment Harris claimed he received on Conrad's behalf. In *Dent v. United States, supra*, we clearly limited the applicability of the missing witness doctrine to those occasions where the testimony of the witness, if called, would be "*likely* to elucidate the transaction in issue." *Id.* at 169–70 (emphasis added). In *Coombs v. United States, supra*, where the missing witness could at most have elucidated evidence of crimes other than that with which the appellant was charged,[4] we stated: "We have extreme difficulty in concluding that the missing witness doctrine could be invoked under circumstances where the transaction to be elucidated is a totally collateral one . . . ." *Id.* at 1317. In the instant case no evidence was adduced attesting to or indicative of the likelihood that Conrad could have testified even as to the passage of the thirty dollars in marked bills; furthermore, Conrad's testimony either corroborating Harris' testimony as to the reasons for his presence in the vicinity of the garage or concerning the passage of the bills would at most have been collateral to the "transaction at issue"—the passage of a Dilaudid tablet from a "holder," through a "juggler," to Detective Thomas. Nor is it likely that such testimony would have illuminated the question of whether Harris had

---

**3.** The *Kotteakos* formulation for determining harmless error is as follows:

> But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.

It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand. [*Conyers v. United States, supra* at 313–14 (quoting *Kotteakos v. United States, supra* at 765, 66 S.Ct. at 1248).]

**4.** Evidence of the other crimes was admissible in *Coombs* under *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964).

possessed narcotics. No evidence suggested that Conrad, if called, would have given testimony unfavorable to Harris. *Cf. Hale v. United States, supra* (the inference of unfavorable testimony was natural and reasonable where the missing witness had previously given testimony before a grand jury, which testimony had incriminated the appellant). It was error to give the missing witness instruction with respect to Harris' brother Conrad.

Nevertheless, after a review of the evidence presented against appellant Harris, I conclude that the giving of the missing witness instruction constituted harmless error under *Kotteakos v. United States, supra,* 328 U.S. at 765, 66 S.Ct. at 1248, and therefore concur in the judgment of my colleagues affirming Harris' conviction.