**Eddie J. MATHIS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 83–69.**

District of Columbia Court of Appeals.

Argued March 5, 1986.

Decided Aug. 20, 1986.

R. Kenneth Mundy, Washington, D.C., for appellant.*

David H. Saffern, Asst. U.S. Atty., with whom Joseph E. diGenova, Asst. U.S. Atty., Michael W. Farrell, Mark J. Biros, and Judith Hetherton, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before MACK and FERREN, Associate Judges, and PAIR, Senior Judge.

PAIR, Senior Judge:

Following a lengthy jury trial, appellant was found guilty as charged of first-degree murder while armed.[1] Appellant, through counsel and *pro se*, now asserts several grounds for reversal of his conviction: (1) denial of a motion for acquittal on the basis of insufficiency of the evidence of identification; (2) the security procedures and devices used at trial deprived appellant of a fair trial; (3) improper admission of evidence of other crimes; (4) several instances of prosecutorial misconduct during closing argument; and (5) due process violations when the trial court failed to inform itself whether a defense witness properly invoked the Fifth Amendment and failed to address the immunity for the witness. Finding the allegations of prosecutorial misconduct of merit, we reverse.

Appellant was tried, along with two codefendants—a friend, Harry Jackson, and his brother, Larry Mathis—for the execution-style murder of Moxie Jackson.[2] To establish motive and intent as to appellant alone, the government presented testimony regarding an armed altercation between appellant and the victim which occurred about three weeks prior to the slaying.[3] The government's case against appellant rested primarily on this incident and the testimony of Deborah Jones, Mathis' cousin and accomplice to the murder. Jones testified that on the night of September 24, 1981, she visited a relative's house where she had dinner. After dinner, she went to the upstairs apartment of Harry Jackson and Erma Turner. Shortly thereafter, appellant, Larry Mathis, Harry Jackson and Paul Dixon arrived. The phone rang and the four left the room. When they reemerged, appellant asked Jones if she wanted to ride with them to "take care of some business," to which she assented.

---

* In addition to counsel's brief, appellant submitted a *pro se* brief, which was also relied upon by the court.

1. D.C.Code §§ 22–2401, –3202 (1981).

2. The codefendants were found not guilty. An accomplice, Paul Dixon, was killed before trial.

3. The incident was apparently sparked by a dispute between appellant and a friend of Moxie Jackson's over a former girlfriend, and involved three men and four women. The government's version of the encounter and the defense's version conflicted in several respects.

Larry Mathis drove with Harry Jackson and appellant in appellant's Mercedes, while Dixon drove with Jones in his yellow Thunderbird to an unascertained woman's apartment in Maryland. There, each member of the group armed himself with a gun and ammunition.

According to the testimony of Jones, after returning to the city and to the area of V Street between Georgia Avenue and 8th Street, N.W., and having received instructions about their respective roles in "the business" from appellant, the group dispersed and was to reunite on 9th Street after "the business" had been effectuated. Jones, instructed to park on 8th Street and cover Dixon, followed Dixon through an alleyway toward 9th Street. Hearing shots, Jones saw appellant firing at the driver's side of a parked car. Jones saw a man, unrelated to the group, move, fired at him, and watched him fall to the ground.

Dixon, who had been at the rear of the car, and Jones then fled to the yellow Thunderbird, and later threw their weapons into the Anacostia River.[4] Rendezvousing at an unidentified apartment in Maryland, appellant thanked Dixon for his assistance and announced "that faggot M___ F___ know who is boss now."

Two other government eyewitnesses, Michael Thompson and Robert Dockery, placed appellant at the scene of the murder and identified him as the killer. Thompson witnessed the shooting as he emerged from Harrington's Club on 9th Street and recognized appellant's profile.[5] Because of their masks, however, he could not identify the two other assassins. Dockery, who had known appellant for years, testified that although he had sought cover under a car once the firing began, he witnessed appellant shooting. He was unable to recognize

the two men accompanying appellant, not because of masks, but because they were unknown to him. Nor could Dockery place Jones as a participant in the shooting. Although he knew both Deborah Jones and Tawanna Mayo, the passenger in Moxie Jackson's car, Dockery identified the passenger as Deborah Jones.[6]

In his defense, appellant highlighted the gaps and inconsistencies in the three government eyewitnesses' testimony. The testimony conflicted regarding: the number of participants, their sex, whether they were masked, where the assailants stood during the shooting, which side of the getaway car two of the assailants got into, and whether the car was double-parked. Furthermore, the defense undermined the credibility of the three government witnesses by eliciting several facts. In addition to immunity, Jones received drugs, money, and a new identity from the government in exchange for her testimony. Like Jones, Thompson was a drug addict and was given concessions by the government. Thompson concededly made his identification of appellant under the influence of heroin and alcohol but denied its effects on his perceptive abilities. With regard to Dockery's testimony, the defense suggested that his vantage point from under a car would have precluded his seeing or recognizing anyone. In addition to underscoring these discrepancies and biases, the defense presented several witnesses who denied Jones' presence in their apartments, two eyewitnesses who denied appellant's presence at the murder scene, and Harrington's employees who knew but saw neither Thompson nor Dockery at the club or murder scene that night.

Appellant alleges several instances of prosecutorial misconduct in its closing and

---

4. Although police were led to the spot where the weapons were allegedly thrown, no weapons were found. Jones also testified that a black trenchcoat was discarded in an alley during flight; none was recovered.

5. Several witnesses testified that the scene of the crime was very well lit with high intensity street lamps.

6. Neither Dockery nor Thompson were able to place the other two codefendants at the scene.

rebuttal arguments.[7] In his counsel's brief, appellant objects to a comment made in the government's rebuttal that denigrated his counsel and singled out appellant from among his codefendants: the prosecutor said appellant's counsel was "leading the pack in this trial" just as appellant "had led the pack" on the night of the murder. Appellant, in his *pro se* brief, points to several other instances of alleged prosecutorial misconduct: repeatedly mischaracterizing appellant by referring to him as "the Godfather," vouching for the credibility of government witnesses, characterizing the murder as an "execution," and alluding to defendant's refusal to take the stand.

Appellant's counsel cites specifically as error the following from the prosecutor's rebuttal argument:

And do you really believe Michael Thompson, Deborah Jones could withstand the cross-examination of Mr. Mundy and two other attorneys? And, boy, they were setting them up. One would ask questions and the other one, and Mr. Mundy would go last. Do you really think, and that's the tactics which they are entitled to have, they were pulling this out of their heads, that they could have withstood all this cross-examination? Not a chance.

Ladies and gentlemen, with all due respect to Mr. Mundy, *he is leading the pack in this trial.* And he has with some witnesses done very well and some not so well.

It's just like on September 25, 1981, his client led the pack that night. (Emphasis added.)

Appellant himself challenges repeated references to him as "the Godfather." The term, he argues, constitutes an improper characterization derived from the following testimony:

JONES: Well, he was playing with the girls.

PROSECUTOR: Will you explain what you mean by, he was playing with the girl?

JONES: Well, he was playing with the girl that was in the apartment. He said something—well, Larry said something—that was his woman or something. And Eddie said something about why would she want him, he was the Godfather.

Appellant also objects to the prosecutor's allegedly vouching for the credibility of government witnesses by arguing: "All we are telling you, ladies and gentlemen, is that their [the three government eyewitnesses'] testimony was accurate as to what happened that night. Same with Mr. Douglas. Same with Ms. Farmer."

 Defense counsel objected at the close of argument to several statements and specifically to the comments about "leading the pack." The court, however, denied a mistrial. Nevertheless, we hold that appellant properly preserved his objection with regard not only to the specific comment of the prosecutor, but also to the alleged errors charged in appellant's *pro se* supplemental brief.[8] In evaluating claims

---

**7.** In his brief, appellant also alleges prosecutorial misconduct when the prosecutor offered a potential defense witness, John Sheffield, prosecutorial immunity in an unrelated case not to testify as a defense witness. Aside from a rare reference to Sheffield as a *Brady* witness, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), we find no evidence in the record to support this allegation. With regard to this claim, therefore, appellant has failed to meet his burden of establishing a record which demonstrates that error occurred. *See Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C. 1982).

**8.** In *Hammill v. United States,* 498 A.2d 551, 554 (D.C.1985), this court rejected the government's argument that the failure of defense counsel to object specifically to certain remarks in rebuttal while objecting to others required a plain error standard for those remarks: "the same degree of specificity in noting an objection hardly seems necessary when counsel is precluded from making a contemporaneous objection and the error is clear." *Id.* at 554–55. We find the distinction that counsel, in this case, chose, but was not required, to not make contemporaneous objections, immaterial in concluding that counsel preserved his objections for appeal. *See also Hawthorne v. United States,* 476 A.2d

of this nature, we must determine whether the prosecutor's comments constituted misconduct and, if so, we must consider the gravity of the misconduct, the direct relationship to the issue of guilt, and the effect of specific curative instructions. *Hammill v. United States, supra* note 8, 498 A.2d at 554. Furthermore, prejudicial error depends in large part on the relative strength of the government's case. *See (Duane) Dyson v. United States,* 450 A.2d 432, 438 (D.C.1982). The standard of review then, if the comments are found to be improper, is "whether we can say with fair assurance, after pondering all that has happened without stripping the erroneous action from the whole that the judgment was not substantially swayed by the error." *See Hammill, supra,* 498 A.2d at 554 (quoting *(Phillip) Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980)). If no objection had been made, our standard of review is the more stringent one of plain error. *Watts v. United States,* 362 A.2d 706, 709 (D.C. 1976) (en banc).

■ On appeal, the government concedes the comment about defense counsel constituted misconduct, *see Taylor v. State,* 22 Ala.App. 428, 116 So. 415 (1928), but argues harmless error.[9] We also find misconduct in the prosecutor's repeated use of the terms "the Godfather" and "the self-proclaimed Godfather" to describe appellant. Given the original playful context of the usage, the prosecutor improperly transformed the characterization to invoke negative and sinister connotations, and to convey strong prejudicial overtones. *See United States v. Steinkoetter,* 633 F.2d 719, 720 (6th Cir.1980) (prosecutor's references to Pontius Pilate and Judas constituted reversible error). *See also Harris v.*

United States, 430 A.2d 536, 540 (D.C. 1981) (prosecutor's analogy to the Mafia was improper); *cf. United States v. Crooks,* 766 F.2d 7, 12 (1st Cir.1985) (while trial court properly excluded testimony associating appellant with the word "Mafia," reference to appellant "and his enforcer friends" who got into the car with ENFORCER license plates not obviously improper).

■ The prosecutor again erred when he vouched for the credibility of the witnesses. As the Supreme Court explained, vouching for the credibility of the witnesses poses two dangers:

> Such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the government and may induce the jury to trust the government's judgment rather than its own view of the evidence.

*United States v. Young,* 410 U.S. 1, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985). *See also* ABA STANDARDS FOR CRIMINAL JUSTICE RELATING TO THE PROSECUTION FUNCTION, 3–5.8(b). This court has repeatedly reproved lawyers for expressing personal opinions as to a witness' veracity during arguments to the jury. *See, e.g., Powell v. United States,* 455 A.2d 405, 408 (D.C.1982), *reh'g denied,* 458 A.2d 412 (D.C.1983). This prohibition takes on greater significance where, as here, the credibility of the witnesses is crucial to the verdict. We continue to condemn this type of prosecutorial misconduct.[10]

164, 170 (D.C.1984). Furthermore, we note that appellant's efforts to establish a record in moving for mistrial were abruptly curtailed by the trial court.

**9.** The government declined to respond to the allegations in appellant's *pro se* supplemental brief.

**10.** We reject appellant's allegation that the prosecutor's arguing that "the cat has got the ball"

constitutes an impermissible reference to appellant's failure to take the stand. The reference is too obscure to be deemed error. Nor do we find references to the murder as the "execution" to constitute error. *But see United States v. DeLoach,* 164 U.S.App.D.C. 134, 504 F.2d 185, 193 (1974), *cert. denied,* 426 U.S. 909, 96 S.Ct. 2232, 48 L.Ed.2d 834 (1976).

■ When, as here, prosecutorial misconduct is found, this court will reverse only when the errors rise to the level of "substantial prejudice." *See Powell v. United States, supra,* 455 A.2d at 405, 411. In examining these claims, we cannot say that, where appellant and his counsel were singled out from among six, where appellant was dubbed a highly prejudicial name, and where the accuracy of government witnesses' testimony was attested to, that the jury was not substantially swayed by the error. A number of factors lead us to conclude that the cumulative effect of the prosecutorial misconduct resulted in substantial prejudice: the closeness of the case, the timing of the comments, and the lack of steps taken to mitigate the effects of the error.

The government's case rested primarily on an accomplice's testimony. Her report of the events was ostensibly bolstered by two other eyewitnesses. Nevertheless, testimony presented was riddled with inconsistencies, and the force of the testimony was reduced by evidence of bias, current and past drug use, implausible viewing, and prior inconsistent statements. The prejudicial effect of the prosecutor's remark about defense counsel was compounded by its being made during rebuttal closing argument. As a result, defense counsel was precluded from contesting the comments before the jury. *See Powell, supra,* 455 A.2d at 411. Furthermore, no curative instructions were issued. While, in its general charge to the jury the trial court issued standard jury instructions that statements of counsel should not be construed as evidence, we find them insufficient to compensate for the prejudice inflicted. *See Hawthorne v. United States,* 476 A.2d 164, 172 (D.C.1984). We note

further that the thrust of the prosecutor's argument and improper comments was directed towards appellant, one of three codefendants and the single defendant found guilty. Accordingly, in light of the cumulative effect of several of these impermissible comments and the relative weakness of the government's case, appellant has demonstrated prejudice and is entitled to a new trial.[11]

■ Finding no merit in appellant's other arguments, we need only address them summarily. First, the motion for judgment of acquittal was properly denied. *See Watson v. United States,* 501 A.2d 791, 792 (D.C.1985). Despite often inconsistent and unreliable testimony, adequate evidence was presented from which, after resolving credibility issues, the jury could have concluded that Eddie Mathis killed Moxie Jackson.[12] Second, the trial court did not abuse its discretion by permitting evidence of a prior altercation. We agree with the government that the incident was used to demonstrate motive rather than identification so that the stricter standard of relevance advocated by appellant is not required. *See Drew v. United States,* 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964); *see also Jackson v. United States,* 329 A.2d 782 (D.C.1974), *cert. denied,* 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975). Third, the security device of a bullet-proof glass door and large number of marshals were both reasonable and warranted by concerns generated by several threats to potential witnesses and law enforcement personnel associated with the investigation. Security methods employed in this case neither focused on appellant nor prejudiced him. *See Holbrook v. Flynn,* —— U.S.

---

**11.** Appellant also claims that the trial court failed to inform itself whether a defense witness properly invoked the Fifth Amendment. Because we reverse and remand on the basis of prosecutorial misconduct, we do not address this issue. *See generally Davis v. United States,* 482 A.2d 783 (D.C.1984). Nor do we address the collateral issue of use immunity raised by appellant. *See generally Earl v. United States,* 124 U.S.App.D.C. 77, 80 n. 1, 361 F.2d 531, 534 n. 1

(1966); *Government of Virgin Islands v. Smith,* 615 F.2d 964, 969 (3d Cir.1980).

**12.** We reach this conclusion after evaluating not only the government's evidence, but defense and rebuttal evidence as well. *See, e.g., Bedney v. United States,* 471 A.2d 1022, 1024 n. 3 (D.C.1984).

**1350**

——, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); *Watts v. United States*, 449 A.2d 308, 311 (D.C.1972); *cf. Estelle v. Williams*, 425 U.S. 501, 512, 96 S.Ct. 1691, 1696, 48 L.Ed.2d 126 (1976) (prejudice is presumed if state compels defendant to stand trial in prison garb).

 Finally, we conclude appellant's argument that the case should not have gone to the jury because the accomplice-witness' testimony was uncorroborated meritless. A conviction may rest solely on the uncorroborated testimony of an accomplice in this jurisdiction. *United States v. Lee*, 165 U.S.App.D.C. 50, 57, 506 F.2d 111, 118 (1974), *cert. denied*, 421 U.S. 1002, 95 S.Ct. 2403, 44 L.Ed.2d 670 (1975). In this case, proper cautionary instructions issued. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.22 (3d ed.). Nevertheless, because of the several instances of prosecutorial misconduct in closing argument, we reverse and remand for a new trial.

*So ordered.*