Howard **BERNSTEIN** and Maxine Bernstein, t/a H & M Enterprises, Appellants,

v.

Daysi P. **FERNANDEZ**, Appellee.

Daysi P. **FERNANDEZ**, Appellant,

v.

Howard **BERNSTEIN** and Maxine Bernstein, t/a H & M Enterprises, Appellees.

Nos. 87–238, 87–283.

District of Columbia Court of Appeals.

Argued May 5, 1988.
Decided March 28, 1991.

David D. Hudgins, for Howard and Maxine Bernstein, appellants in No. 87–238 and appellees in No. 87–283.

William I. Martin for Daysi P. Fernandez, appellee in No. 87–238 and appellant in No. 87–283.

Before ROGERS, Chief Judge,* and BELSON and TERRY, Associate Judges.

TERRY, Associate Judge:

Daysi Fernandez sued her landlords, Howard and Maxine Bernstein, trading as H & M Enterprises (H & M), because of leaking and falling ceilings that were frequently torn down and repaired, but always leaked and crumbled anew, and because of rodent infestation that was never eliminated, although traps and poison did kill some rodents. Fernandez sought compensatory damages for breach of a settlement agreement and consent order (in which H & M had agreed to correct the ceiling and rodent problems, among numerous others), breach of implied warranty of habitability, nuisance, and inten-

* Judge Rogers was an Associate Judge of the court at the time of argument. Her status changed to Chief Judge on November 1, 1988.

tional infliction of emotional distress, as well as punitive damages on all four claims. After a seven-day trial, the jury found for Fernandez on every claim, but the trial court granted a judgment notwithstanding the verdict on the emotional distress claim and set aside its compensatory and punitive damage awards. We hold that the trial court correctly granted this judgment n.o.v. In addition, however, we hold that it should have directed a verdict for H & M on the nuisance claim, and should also have set aside the other punitive damage awards because punitive damages are not available for contract-based claims. We therefore affirm the judgment in part and reverse it in part.

## I. FACTUAL BACKGROUND

In October 1977 Mrs. Fernandez moved into a ground-floor apartment at 2633 Adams Mill Road, N.W., a four-story, multi-unit building, with her husband, aunt, and uncle. Some time thereafter she had a child, and in November 1982 her three children from El Salvador began living there as well, joined by a foster child who arrived in 1986. The record does not reveal what became of the husband, aunt, and uncle, but Mrs. Fernandez testified that from November 1982 onward only she and the children lived in the apartment.

Fernandez's dispute with her landlord began early in 1981. After January 31, 1981, she began to withhold her rent because of defects in the apartment, and in response H & M filed a suit for possession in the Landlord and Tenant Branch of the Superior Court. This suit was resolved by a settlement agreement which provided that H & M would make various repairs by May 31, 1982, whereupon rent payments deposited in the court registry would be divided and disbursed to the parties. The agreement also provided that, if the repairs were not made, the rent would be reduced by twenty percent. The settlement agreement covered a period of slightly more than one year, from May 5, 1982, through May 30, 1983.

In August 1982 Mrs. Fernandez went back to court, alleging that H & M had not fulfilled its part of the settlement agreement, in that it had not made some of the agreed-upon repairs and had performed others in a less-than-workmanlike manner. In a consent order dated August 12, H & M agreed that it would complete the repairs by August 31, and that if Fernandez had to return to court to enforce the order, she would be entitled to reasonable attorney's fees.

In November 1983 Mrs. Fernandez filed a civil action against H & M, alleging *inter alia* that she had been injured when part of the kitchen ceiling in her apartment fell on her head. The complaint in that case recited some of the past history of defects in the apartment and H & M's failure to repair them satisfactorily. Fernandez's personal injury claims were promptly settled, but the settlement agreement expressly did not resolve any of her "non-personal injury claims in [the landlord-tenant case]."

In June 1984 Fernandez filed a second civil action—the instant case—against H & M for breach of implied warranty of habitability, breach of the May 1982 settlement agreement and the August 1982 consent order, nuisance, intentional infliction of emotional distress, and specific performance of the lease agreement (the specific performance count was later voluntarily dismissed). Shortly before the case came to trial, H & M filed a motion *in limine* to limit Fernandez's proof to events occurring after the November 1983 settlement and to foreclose litigation about events occurring after the filing of her complaint in June 1984. The court denied the motion.

At trial Mrs. Fernandez testified that the bathroom ceiling continually leaked, and that the ceilings in other rooms leaked intermittently; they were replastered several times, but the repairs did not last. She also told of the repeated presence of dead rats and mice in the kitchen, which caused her to avoid the kitchen entirely, sometimes made her sick to her stomach, and—when she was able to sleep at all—gave her nightmares. Roaches also were a serious problem. In addition, Fernandez testified about other disruptive repairs; for example, a gas leak required tearing out the kitchen ceiling, and new floors had to be installed. During her testimony Mrs. Fernandez often referred to a

large number of photographs, which were admitted into evidence, sometimes individually, sometimes in groups. On cross-examination she acknowledged that some of the photographs depicted repairs in progress, such as ceilings torn out in order to be rebuilt, but she added that some of the repairs took a long time to complete (in one instance as long as six weeks), and that in the meantime she had to live amid the mess and the debris.

Mrs. Fernandez's testimony was corroborated by two of her neighbors, Diana White and Joseph Randolph. They both testified that they had been frequent visitors in the Fernandez apartment and had seen the falling ceilings and the generally deplorable conditions. Mrs. White also made reference to the roaches and "the time the mouse ran across the floor" while she was there.

Counsel for H & M then moved for directed verdicts on all the claims. The court denied the motion except with respect to the emotional distress claim and its accompanying request for punitive damages; as to those, it reserved its ruling.

In defense H & M called five repairmen, who testified about their various repairs of the leaking and falling ceilings in the Fernandez apartment. The testimony of the repairmen reinforced H & M's contention that many of the photographs introduced by Fernandez depicted repairs in progress. The repairmen stated that the leaking in the ceilings was principally caused by tenants upstairs who showered by pouring buckets of water over themselves, splashing it all over the floor, and by overflow from a stopped-up sink. One repairman, Horace Johnson, testified that the wooden slabs in the bathroom ceiling were rotten and produced a very bad smell. Another, Malcolm Wells, said he had repaired a drainpipe that was leaking into the Fernandez apartment. Wells and other witnesses testified that Mrs. Fernandez kept the apartment in an unsanitary condition, with dirty dishes in the sink, trash scattered about, and pots and pans—many of them containing food—at various places throughout the kitchen. The resident manager, Daniel Staten, said that the apartment was "very dirty" and that he frequently saw food in uncovered pots and dishes in the kitchen, where they would attract roaches and rodents. He stated that when Mrs. Fernandez asked him how she could get rid of all the rats and mice, he told her that she would "have to move some pots and food out of the way and put [them] in a safe place." Mr. Staten's testimony, like that of Mrs. Fernandez, was supported by photographs, which were introduced into evidence.

Two housing inspectors, Roger Lovett and Catherine Booth, also testified for H & M. On one visit Lovett saw that the bathroom ceiling was wet, with "missing parts" and peeling paint, and noticed the odor of a dead rat behind a kitchen wall. When he returned, however, he found that the ceiling had been replastered; there were also rodent traps out, and the rodent odor was gone. The first visit was on June 29, 1984; reinspection on July 9, ten days later, showed all problems resolved except the rodents. On July 24 he found traps placed here and there in the apartment, showing "abatement" of the rodent problem. An inspection on October 29, 1984, again revealed damp ceilings, dead rodent odor, and rodent droppings, but these problems had disappeared when he returned for a reinspection on November 2.

Booth's testimony was similar to Lovett's. She said that she found several violations between February 1984 and March 1985 in the bedrooms, bathroom, living room, and kitchen. They were all eventually abated, but when she inspected the apartment again on March 2, 1985, she found that many of them had recurred. Some of them were still present when she made her last inspection in April 1985.

The jury returned a verdict for Mrs. Fernandez on all counts, awarding her a twenty percent abatement of rent, the remedy provided in the settlement agreement, for the period governed by that agreement ($464.40); a complete return of rent for the remaining months ($10,578); $45,000 in damages for nuisance; $40,000 for emotional distress; and $50,000 in punitive damages on each of the four counts ($200,000 altogether in punitive damages). The total award was $296,042.40.[1]

1. The jury also found that Mrs. Fernandez was indebted to H & M for back rent in the amount

The court later granted a judgment n.o.v. on the emotional distress claim and set aside both the compensatory and punitive damage awards on that claim. In a subsequent order the court directed Mrs. Fernandez to accept a remittitur of each of the three remaining punitive damage awards to $20,000 or face a new trial. She accepted the remittitur, and a final judgment was entered, from which both parties appeal.

## II. H & M's Appeal

### A. Asserted trial errors

H & M contends that evidence of the apartment's state of disrepair after the filing of the complaint was improperly admitted because it was beyond the scope of the complaint and, to a large extent, beyond the scope of pre-trial discovery as well. We disagree.

Mrs. Fernandez's complaint plainly notified her landlords that the violations alleged were ongoing. Paragraph 29 said that "plaintiff and her family are ... subject to a continuous threat to their personal health, safety, welfare and well-being," and paragraph 30 stated that "defendant's wrongful acts or omissions are continuing in nature...." This was made even more clear in Fernandez's answers to interrogatories Nos. 6, 7, and 18. The "new" matter about which H & M now complains was materially identical to the allegations made in the complaint: leaking and falling ceilings, rodent infestation, and incompetent repairs of both. Accordingly, H & M had notice of these claims. *See Nelson v. Covington,* 519 A.2d 177, 178–179 (D.C.1986). We note also that the trial court granted, over H & M's objection, a request by Fernandez to amend the complaint to cover explicitly the time period after the complaint was filed. The decision to allow such an amendment is, of course, within the trial court's discretion. *E.g., Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Bennett v. Fun & Fitness of*

*Silver Hill, Inc.,* 434 A.2d 476, 478 (D.C. 1981). Here, because H & M was aware of the substance of Fernandez's claims from the beginning, there was no prejudice and hence no abuse of discretion.[2] *Gordon v. Raven Systems & Research, Inc.,* 462 A.2d 10, 13 (D.C.1983); *see Randolph v. Franklin Investment Co.,* 398 A.2d 340, 350–351 (D.C. 1979) (en banc). This lack of prejudice also defeats H & M's contention that Fernandez was improperly permitted to go beyond the scope of the pre-trial order. *Taylor v. Washington Hospital Center,* 407 A.2d 585, 591–593 (D.C.1979), *cert. denied,* 446 U.S. 921, 100 S.Ct. 1857, 64 L.Ed.2d 275 (1980).

As to the photographs of the dilapidated ceilings, which were taken after the complaint was filed and after discovery was closed, H & M contends that it was prejudiced because these photographs were of repairs in progress and did not accurately depict the state of the ceilings before, or especially after, the repairs were made. This argument was not raised until the day before trial, which is one reason why the court rejected it. We reject it as well. While evidence that has not been subject to discovery should be admitted with caution, in this instance there was no surprise or prejudice to H & M. *See Taylor, supra,* 407 A.2d at 591–592. Counsel for H & M quickly concluded that these photographs were of repairs in progress and presented ample evidence to support that theory. It was, however, within the jury's province to find that the photographs depicted the true state of affairs in the Fernandez apartment. Alternatively, the jury may have accepted that the photographs were of repairs in progress, but decided nevertheless that the frequency of these repairs and the large quantity of debris they rained on Fernandez's possessions, on her floors, and in her bathtub and toilet showed an apartment that was not kept in

of $1,857.60, which the court later subtracted from the total award.

**2.** Part of H & M's claim of prejudice is its alleged surprise at having to defend against events occurring after the filing of the complaint. However, if H & M really had no notice of Fernandez's

intent to introduce such evidence, as it claims, it could not have prepared and filed a motion *in limine* on this very issue before the trial began. The fact that it did so undermines its assertion of prejudice.

good repair by its landlord.[3]

In arguing that its motion for judgment n.o.v. should have been granted as to the alleged breach of the consent order and of the implied warranty of habitability, H & M points to two asserted deficiencies in the evidence. First, it says, the trial court erred by failing to recognize that the housing inspectors found adequate rodent abatement measures in two inspections, and that there was no evidence of rodents in other apartments, although housing regulations provide that landlords are responsible for exterminating rodents only when they infest more than one unit of a multi-unit dwelling.[4] The short answer to this argument is that the inspectors' findings were not conclusive, especially for the entire time period encompassed by this litigation; indeed, the trial court disputed the inspectors' conclusion that the rodent problem was really abated. Furthermore, the evidence of extensive rodent infestation in Fernandez's apartment would entitle a reasonable trier of fact to infer that rodent infestation existed in at least one of the other apartments in the building.

H & M also claims error in the court's exclusion of a plumbing invoice on hearsay grounds. We hold that the court could reasonably reject H & M's contention that the invoice was offered to prove good faith repair efforts, and not the truth of the matter asserted (namely, that the pipes did not leak). We note in any event that the trial court questioned the validity of H & M's explanation of the leaks. Furthermore, the exclusion of the invoice as hearsay (i.e., the refusal to admit it as a business record), if error, was harmless. Whether the leak in the bathroom ceiling came from pipes or from water splashed on the floor above is irrelevant; either way, water persistently leaked through the ceiling, causing serious difficulties for Mrs. Fernandez. This was a problem which the landlord had a duty to repair, regardless of its cause. H & M's characterization of the plumbing invoice as "crucial to the defense" is, in our view, greatly exaggerated, and its exclusion does not warrant either a judgment n.o.v. or a new trial.

### B. The settlement breach

H & M challenges the jury's award of damages for its breach of the May 1982 settlement agreement and the August 1982 consent order. It asserts that, of the thirty-three repairs which were covered by these documents, only three were proven not to have been made—two involving falling ceilings (one in the bathroom and one in a bedroom) and one involving rodent infestation—and that good faith efforts were made to alleviate these problems. H & M argues that the trial court should have granted its motion for directed verdict on this count or, alternatively, its motion for judgment n.o.v.

Our standard of review is the same with respect to both motions. The denial of either a motion for directed verdict or a motion for judgment n.o.v. must be affirmed unless the evidence, viewed in the light most favorable to the non-movant, would permit reasonable persons to return a verdict only in favor of the moving party. *Vuitch v. Furr*, 482 A.2d 811, 813–814 (D.C.1984) (directed verdict); *Washington Welfare Ass'n v. Poindexter*, 479 A.2d 313, 315 (D.C.1984) (judgment n.o.v.). The evidence here does not meet this standard. Proof that three

---

**3.** H & M also contends that the photographs lacked a proper foundation. It asserts that the defense was not permitted to cross-examine on the photographs before they were admitted, but this assertion is belied by its own brief, which discusses the cross-examination of Fernandez on the photographs. Further, H & M complains that Fernandez did not identify the photographs individually, but only identified the eight folders in which they were contained. The trial court, however, approved this procedure beforehand without any objection from H & M. These contentions do not convince us that the trial court abused its discretion in determining that the pho-

tographs accurately reflected what they purported to depict and hence were admissible. *Sinai v. Polinger Co.*, 498 A.2d 520, 532–533 (D.C.1985); *Rich v. District of Columbia*, 410 A.2d 528, 531–532 (D.C.1979).

**4.** In this jurisdiction it is well settled that housing regulations "create legal rights and duties enforceable in tort by private parties." *Javins v. First National Realty Corp.*, 138 U.S.App.D.C. 369, 378, 428 F.2d 1071, 1080 (citations omitted), *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970).

provisions of the settlement agreement or the consent order were breached is enough to support the jury's verdict, especially since falling ceilings and rodent infestation were important items among the many things that H & M agreed to repair or alleviate. Furthermore, H & M agreed to make actual repairs, not merely to make a good faith effort to do so. Even assuming that the repair efforts were made in good faith, good faith was no defense to the breach of either the settlement agreement or the consent order.[5] Ample evidence supported the jury's verdict on this count.

### C. The warranty of habitability

H & M asserts three defects in Fernandez's proof of the breach of warranty of habitability. It contends, first, that its defense of good faith repairs negated any breach of the warranty; second, that Fernandez was required to prove the apartment's value when it was in good repair and also when it was in disrepair, but that no evidence of either value was presented at trial; and third, that the value of the apartment in disrepair (sometimes known as the "shell value") had to be at least one-third of the apartment's rental value. Because of these supposed defects, H & M argues that it was entitled to either a directed verdict or a judgment n.o.v. on the warranty of habitability claim, or at least a substantial remittitur. We cannot agree.

■■■■ H & M's good faith repair defense, drawn from *Watson v. Kotler, supra* note 5, has no application to this case. Even assuming that such a defense exists, the facts of this case make it easily distinguishable from *Watson*. Moreover, there was evidence before the jury allowing it reasonably to find that H & M's "repair" efforts were not made in good faith (*e.g.*, the fact the same repairs had to be made over and over again), so that the denials of a directed verdict and judgment n.o.v. on this ground were proper. The

denial of the motion for new trial on the same ground was well within the trial court's broad discretion. *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100, 1110–1111 (D.C.1986); *Rich v. District of Columbia, supra* note 3, 410 A.2d at 535–536. Refusal to grant a remittitur was likewise within the trial court's discretion in the exercise of its duty to guard against jury verdicts that are excessive or against the weight of the evidence. *Davis v. Abbuhl*, 461 A.2d 473, 476 (D.C.1983); *see Afro–American Publishing Co. v. Jaffe*, 125 U.S.App.D.C. 70, 83, 366 F.2d 649, 662 (1966) (en banc).

■■■■ H & M argues that evidence of its efforts to repair the apartment was inadmissible to show its negligence because of the "public policy" against using evidence of repairs made by a party to show that party's prior negligence. *See Fine v. Giant Food Stores, Inc.*, 163 F.Supp. 231, 236–237 (D.D.C.1958), *rev'd on other grounds*, 106 U.S.App.D.C. 95, 269 F.2d 542 (1959); *see also* Fed.R.Evid. 407. This argument misunderstands the repair evidence rule and misperceives the issue to which that evidence was relevant. Fernandez complained that the repairs themselves were inadequate and ineffective, which H & M denied. It was not negligence before the repairs but the quality of the repairs that was at issue, so that Fernandez had to prove the repairs were made in order to show that they were inadequate. The repair argument is also directly contradicted by other parts of H & M's brief, where it argues that its "good faith repairs" were an important part of its case and a complete defense to many of Fernandez's claims.

■■■■ Relying on *Cooks v. Fowler*, 147 U.S.App.D.C. 213, 455 F.2d 1281 (1971), H & M contends that the court erred in failing to reduce the damages by one-third of the rent, the apartment's "shell value." *Cooks* does not support this contention. In that case the

---

**5.** H & M relies on *Watson v. Kotler*, 264 A.2d 141 (D.C.1970), to support its assertion that good faith efforts to make repairs may constitute a complete defense. *Watson* is readily distinguishable from the case at bar. In *Watson* the tenant signed a lease when the apartment was in violation of the housing code, but the violations were corrected within two months, with no hint of delay. We held that the tenant could not raise them to bar an eviction suit based on non-payment of rent two years later. *Watson* has no bearing on this case, in which adequate repairs of the ceilings and abatement of the rodent infestation were delayed for many years.

court had to determine the amount of a security deposit which it had previously required to be paid monthly as a condition for the granting of a stay. Devising a formula "in an effort to meet fairly and expeditiously the exigencies of this particular. case," *id.* at 215, 455 F.2d at 1283, the court settled on a figure of one-third of the rent as a "rough" but "reasonable," though "not wholly satisfactory," approximation of the value of the apartment as "shelter in the narrowest sense...." *Id.* at 214–215, 455 F.2d at 1282–1283. The court came up with this formula because it had earlier rejected the tenant's assertion that the apartment was worth nothing, but neither the tenant nor the landlord had presented any evidence of what the "as is" rental value was.

By its own terms, the *Cooks* case is of very limited precedential value, and in this instance we find it totally inapplicable because H & M's contention that the value of the apartment in good repair and its value "as is" were not shown is simply wrong. The value of the apartment in good repair was established by proof of the amount of the monthly rent, as *Cooks* itself teaches. *Id.* at 214, 455 F.2d at 1282. Furthermore, the persistent and extreme problems with leaking and falling ceilings and rodent infestation were sufficient to allow the jury to find that the apartment's "as is" value was zero, thereby allowing a complete abatement of rent. Expert testimony or other evidence of the market value of an apartment in such condition was not necessary; evidence of the problems themselves was enough. *See Javins v. First National Realty Corp., supra* note 4, 138 U.S.App.D.C. at 380–381, 428 F.2d at 1082–1083.

#### D. *Nuisance*

H & M contends that the trial court should have granted a directed verdict for it on Fernandez's nuisance claim. We agree. Fernandez may have suffered a "nuisance" in the colloquial sense of the word, but not in the legal sense.

Fernandez's nuisance claim was based on H & M's alleged failure to repair the defective conditions of the apartment, which interfered with her use and enjoyment of her leasehold. Her claim has two flaws. First, the interference of which she complained was the result of the falling ceilings and the infestation of rodents. We hold that these problems, whatever else they may have been (*viz.,* breach of the settlement agreement, breach of the warranty of habitability), did not amount to a nuisance.[6] There appears to be no District of Columbia authority directly in point,[7] but there is case law in our neighboring jurisdiction, Maryland, barring nuisance claims by tenants against landlords based on similar facts. In such cases "the plaintiff must recover, if at all, on the theory of negligence." *State ex rel. Bohon v. Feldstein,* 207 Md. 20, 35, 113 A.2d 100, 107 (1955); *accord, Little v. Union Trust Co.,* 45 Md.App. 178, 185, 412 A.2d 1251, 1255 (1980) (tenants may not "proceed against a landlord for personal injuries based on a nuisance theory" but must "proceed by way of traditional negligence theory, as the Court ruled in *State [ex rel. Bohon] v. Feldstein* ").[8] The rationale for these cases is that "[n]uisance ordinarily is not a separate tort in itself but a type of damage," so that a plaintiff seeking to recover on a nuisance theory must allege and

---

6. We note that damages for the type of injuries alleged by Mrs. Fernandez in support of her nuisance claim, assuming they were proven, would be obtainable in an action for breach of the warranty of habitability. Indeed, she recovered such damages in this case, and we are affirming that portion of the trial court's judgment.

7. The cases which Fernandez cites in her brief all involve negligence claims, violations of housing regulations, or breaches of the warranty of habitability. We have found no District of Columbia case allowing a tenant to sue a landlord on a nuisance theory for such alleged wrongs.

8. Although *Little* was brought as a public nuisance action rather than one involving a private nuisance, it was based on the same general type of housing deficiencies as are involved here, *e.g.,* holes in the roof, sewer backups, etc., which were alleged to be public nuisances under various regulations and municipal ordinances. The case upon which *Little* relied, *State ex rel. Bohon v. Feldstein,* was a private nuisance action, a fact which suggests that for the purpose of our holding in this case, it makes no difference whether the alleged nuisance is public or private.

prove some sort of tortious conduct. *Feldstein, supra*, 207 Md. at 34, 113 A.2d at 107. Because this rationale is consistent with District of Columbia law, *see District of Columbia v. Fowler*, 497 A.2d 456, 461 (D.C.1985), we adopt the Maryland precedents and hold that the falling ceilings and rodent invasions did not constitute a nuisance.[9]

■ Second, damages flowing from a nuisance are measured by the diminution of the property's value caused by the nuisance's interference with the enjoyment of the property. *District of Columbia v. Totten*, 55 App.D.C. 312, 313–314, 5 F.2d 374, 375–376, *cert. denied*, 269 U.S. 562, 46 S.Ct. 21, 70 L.Ed. 412 (1925); *see* PROSSER, *supra* note 9, § 88A, at 632. In this case the so-called nuisance could not have further diminished the value of Mrs. Fernandez's leasehold because her recovery of all the rent as damages for the breach of warranty of habitability (for the same defects in the premises which allegedly resulted in the nuisance) meant that the leasehold had no value at all.[10]

We therefore hold that a directed verdict for H & M should have been granted on the nuisance claim because no reasonable person could find H & M liable in damages for a nuisance on the facts of this case.[11]

### E. *Punitive damages*

H & M contends that the jury should not have been allowed to award punitive damages on the claims alleging breach of the settlement agreement and consent order, breach of warranty of habitability, and nuisance. We agree.

■ First, because the nuisance claim should have been resolved in H & M's favor, compensatory damages were not available on that claim. An award of punitive damages cannot stand alone, unaccompanied by compensatory damages. *Zanville v. Garza*, 561 A.2d 1000, 1001–1002 (D.C.1989) (citing cases). We must therefore reverse the award of punitive damages on the nuisance claim.

■ As to the breach of the settlement agreement and consent order and the breach of warranty of habitability, the punitive damage awards on those two claims must also be reversed, but for a different reason. "Punitive damages will not lie for breach of contract, even if it is proven that the breach is willful, wanton, or malicious." *Bedell v. Inver Housing, Inc.*, 506 A.2d 202, 206 (D.C.1986) (citing cases). The only exception to that rule recognized in the District of Columbia is that "where the alleged breach of contract 'merges with, and assumes the character of, a willful tort' . . . punitive damages [will] be available." *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C.) (citations omitted), *cert. denied*, 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982); *see Washington Medical Center, Inc. v. Holle*, 573 A.2d 1269, 1284 n. 24 (D.C.1990). No such merger occurred in this case; Fernandez's proof, even viewed in its most favorable light, simply did not establish a willful tort on the part of H & M.[12] Therefore, neither the breach of the consent order[13] nor the breach

---

9. We recognize, of course, that the view of the Maryland courts is not universally held. *See* R. SCHOSHINSKI, AMERICAN LAW OF LANDLORD AND TENANT § 3.9 (1980 & 1990 Supp.) (citing cases). Nevertheless, we see no reason to expand the scope of District of Columbia landlord-tenant law by importing into it the "impenetrable jungle" of the law of nuisance. W. KEETON, PROSSER & KEETON ON THE LAW OF TORTS § 86, at 616 (5th ed.1984) (hereafter PROSSER).

10. Although this cannot be said for the breach of the settlement agreement and consent order, those documents expressly limited recovery for violation to a twenty percent rent abatement, foreclosing further recovery for any nuisance.

11. Accordingly, we need not consider H & M's additional assignments of error involving the trial court's instructions on the nuisance claim.

12. A "willful tort" is one which is "calculated rather than inadvertent, flagrant, and in disregard of obligations of trust...." *Brown v. Coates*, 102 U.S.App.D.C. 300, 303, 253 F.2d 36, 39 (1958), quoted with approval in *Den v. Den*, 222 A.2d 647, 648 (D.C.1966).

13. A consent order is a contract. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 235–237, 95 S.Ct. 926, 933–935, 43 L.Ed.2d 148 (1975); *Baker v. District of Columbia*, 494 A.2d 1299, 1302 (D.C.1985). It is also, of course, a court order, enforceable like any other court order. *Moore v. Jones*, 542 A.2d 1253, 1254 (D.C.1988).

of the settlement agreement can support an award of punitive damages.

 We reach the same conclusion regarding the breach of warranty of habitability. Although this court has noted that the concept of such a breach developed as a hybrid of tort and contract claims, *Berman v. Watergate West, Inc.*, 391 A.2d 1351, 1355 (D.C.1978), the warranty of habitability is implied in leases, and, as is true of most modern warranties, a claim for a breach is essentially a contract cause of action. *Id.* H & M's breach of the warranty of habitability did not merge with a tort to support an award of punitive damages. *Sere, supra,* 443 A.2d at 37.[14]

### F. Other contentions

 H & M makes three other arguments which can be briefly discussed, for they are all without merit.

#### 1. Improper opening statement

In his opening statement, in telling the jury why his client sought punitive damages, counsel for Mrs. Fernandez said the landlord was one "who won't follow the law, who's an outlaw. The evidence will show that." H & M's counsel objected to this statement, citing a case in which a murder conviction was reversed after the prosecutor repeatedly referred to the defendant as "the Godfather."[15] The trial court refused to tell the jury to disregard the "outlaw" remark because of its context, but told Fernandez's counsel not to use the term again. H & M contends that a new trial should have been granted because of this remark.

We readily agree that calling the landlord an "outlaw" was improper. *See United States v. Somers*, 496 F.2d 723, 737–739 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). On the record as a whole, however, we are satisfied that the comment did not result in any significant

prejudice to H & M. Considered in the context of the entire trial, the word "outlaw" can be read as suggesting merely that H & M was not in compliance with housing regulations. We have affirmed judgments in other cases when counsel made comments far more outrageous than what we find here. In one such case, for example, the prosecutor analogized the defendant to a member of the Mafia. *Harris v. United States*, 430 A.2d 536, 540–541 (D.C.1981). In another, the plaintiff's counsel accused defense witnesses of fabricating their testimony and attempting to perpetrate a fraud on the jury. *Psychiatric Institute v. Allen,* 509 A.2d 619, 627–628 (D.C.1986). We found these remarks offensive but not prejudicial in the context of the record as a whole. In light of these and similar precedents, we conclude that counsel's isolated comment here does not require a new trial.

#### 2. The interruption from the audience

 H & M seeks a new trial because the audience was often filled with supporters of Fernandez, one of whom even walked past the bar and handed Fernandez's lawyer a note, explaining to the astonished trial judge that she could not hear counsel's questions on cross-examination. This incident brought no objection at the time, and in our view it does not necessitate reversal of the trial court's denial of H & M's motion for a new trial. *Rich v. District of Columbia, supra* note 3, 410 A.2d at 535–536. We find no basis in the record for H & M's assertion that this incident indirectly amounted to calling other tenants whom the trial court would not allow to testify about the conditions of their respective apartments.[16]

#### 3. Subject-matter jurisdiction

 H & M argues that the trial court did not have subject matter jurisdiction of Fernandez's claims because jurisdiction still belonged to the Landlord and Tenant

---

14. As in the case of the nuisance claim, see note 11, *supra*, we need not consider H & M's contentions with respect to the trial court's instructions on punitive damages.

15. *Mathis v. United States*, 513 A.2d 1344 (D.C. 1986).

16. The interrupter, however, did give her address, which was that of a building next door to the one where Fernandez lived. The jury knew that this building was also owned by H & M.

Branch, where the original suit for possession (which was settled by the consent order) began. This argument is frivolous. Jurisdictional bars do not exist between divisions or branches of the Superior Court. *Ali Baba Co. v. Wilco, Inc.,* 482 A.2d 418, 425–426 (D.C.1984); *Andrade v. Jackson,* 401 A.2d 990 (D.C.1979).

### III. FERNANDEZ'S APPEAL

■ In her cross-appeal Mrs. Fernandez challenges the trial court's granting of a judgment n.o.v. on her claim of intentional infliction of emotional distress. The trial court ruled that the evidence of H & M's failure to make effective repairs was not so outrageous as in other landlord-tenant cases supporting emotional distress claims, in which the landlords made no attempt to repair defective premises. We affirm that ruling.

■ The tort of intentional infliction of emotional distress has three elements. A defendant will not be liable unless he or she engages in (1) "extreme and outrageous conduct" which (2) "intentionally or recklessly" causes (3) "severe emotional distress to another." RESTATEMENT (SECOND) OF TORTS § 46 (1965), cited with approval in *Sere v. Group Hospitalization, Inc., supra,* 443 A.2d at 37, and *Waldon v. Covington,* 415 A.2d 1070, 1076 (D.C.1980). The requisite intent or recklessness "can be inferred from the outrageousness of the acts." *Howard University v. Best,* 484 A.2d 958, 985 (D.C.1984) (citations omitted). However, a defendant will be liable "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." RESTATEMENT, *supra,* § 46 comment d. Viewed in the light most favorable to Mrs. Fernandez, the evidence here simply does not meet this standard; the trial court ruled correctly in setting aside the award of compensatory damages.[17] It fol-

lows that we must also reject Fernandez's contention that the punitive damage award on this claim should be reinstated, because an award of punitive damages is permissible only when it is accompanied by an award of compensatory damages. *Zanville v. Garza, supra,* 561 A.2d at 1001–1002.

### IV. CONCLUSION

Those portions of the trial court's judgment which award punitive damages for breach of the settlement agreement and consent order and breach of the warranty of habitability are reversed. The award of compensatory and punitive damages for nuisance is also reversed. In all other respects, the judgment is affirmed.

*Affirmed in part, reversed in part.*

ROGERS, Chief Judge, concurring:

I join the majority opinion and write separately only to make clear that I do not read the majority to conclude that a nuisance claim may never be brought by a tenant against a landlord, but rather, that on the facts of this case, Fernandez failed to meet her burden of proof. *See* majority opinion at 1073–1074. The Maryland cases cited by the majority are not dispositive. In *Little v. Union Trust Co.,* 45 Md.App. 178, 185, 412 A.2d 1251, 1255 (1980), the Court of Special Appeals held that a cause of action for public nuisance was not available. In *State ex rel. Bohon v. Feldstein,* 207 Md. 20, 33, 113 A.2d 100, 106, the Court of Appeals held open the possibility of a nuisance claim where the landlord "demise[d] premises which are . . . in themselves a nuisance. . . ." Our decision in *District of Columbia v. Fowler,* 497 A.2d 456 (D.C.1985), addressed only the requirement of prior notice before the District may be held liable for maintaining a nuisance as a result of defective conditions in streets and highways. Moreover, as the majority acknowledges, see majority opinion at 1073 n. 9, a nuisance cause of action has generally been recognized under certain circumstances.

---

**17.** Given the very strict standard of liability imposed by our District of Columbia case law, we decline to follow the cases from other jurisdictions, cited to us by Fernandez, which have found liability for intentional infliction of emo-

tional distress on somewhat similar facts. *E.g., Simon v. Solomon,* 385 Mass. 91, 96, 431 N.E.2d 556, 562 (1982); *Hilder v. St. Peter,* 144 Vt. 150, 160, 478 A.2d 202, 209 (1984).

*See* R. Schoshinski, American Law of Landlord and Tenant § 3.9 (1980 & 1990 Supp.) (and cases cited) (nuisance cause of action may be available where claim is based on conduct in "areas of premises over which the landlord has retained control").